## Graham Gibbs v. Clarkson S. Linabury.

*What not impeaching one's own witness.* Where the plaintiff has called the defendant as a witness to prove his signature to the instrument sued upon, and the defendant has testified that the signature resembles his handwriting but that he could not swear it was his, and when asked if he remembers what he testified to at a former trial, has replied that he testified the same as on the present trial, it is competent for the plaintiff to prove by another witness what the defendant testified to on such former trial. Such testimony is not objectionable on the ground that it tends to contradict or impeach the defendant whom the plaintiff had made his own witness.

*Sufficiency of proof of signature a question of fact.* The plaintiff having testified to the admissions and explanations of defendant on the former trial, of the circumstances which attended the signing of the instrument sued upon, if in fact it was signed by defendant at all, and these circumstances, having some tendency to prove the signature to be that of the defendant, it was not error to admit the instrument to be read in evidence. The sufficiency of the preliminary evidence was a question of fact for the jury.

*Promissory note: What a defense to, in hands of bona fide purchaser: Fraud.* When the defendant unwittingly signs an instrument in the form of a negotiable promissory note, relying upon false representations made to him, at the time, that the instrument he is signing is a mere duplicate of a contract just previously signed by him, making him an agent for the sale of a patent hayfork, under circumstances devoid of any negligence on his part, and where fraudulent means are taken to prevent him from noticing the body of such pretended duplicate, and he delivers the same in ignorance of its true character, believing it to be the mere duplicate contract which he supposed he had signed, such instrument is to be regarded as a forgery, and cannot be enforced even in the hands of a *bona fide* purchaser.

*Maxim construed.* The maxim that when one of two innocent persons must suffer by the acts of a third the loss must be borne by the person who enables such third person to occasion it, does not apply to such a case. This maxim supposes the action of the ·person upon whom it imposes the loss to have proceeded from intelligence, and not to have been the result of duress. It presumes the assent of the will of the actor. If, from any cause, the assent of the will is wanting, the result is the same as if the act were done under duress, or by an insane man. *Burson v. Huntington, 21 Mich., 415, cited and approved.*

*Heard April 14. Decided April 18.*

Error to Oakland Circuit.

A statement of the case appears in the opinion.

*John A. Fairfield* and *Crofoot & Brewer,* for plaintiff in error, in reference to liability on commercial paper executed under such circumstances, cited *Foster v. Mackinnon, 4 Law R., 1868-9 (Com. Pleas), 704; Putnam v. Sullivan, 4 Mass.,*

*45; Nance v. Lary, 5 Ala., 370; Fay v. Smith, 1 Allen, 477; Wade v. Worthington, 1 Ibid., 561; Wor. Co. Bk. v. Dor. & M. Bk., 10 Cush., 488; Gould v. Segee, 5 Duer, 260; Hall v. Wilson, 16 Barb., 548.*

*O. F. Wisner*, for defendant in error, to the same point cited, *Shipley v. Carroll, 45 Ill., 285; McDonald v. Muscatine Natl. Bk., 27 Iowa; Isnard v. Torres, 18 La., An., 103; Rex v. Ruth*, cited in *Byles on Bills* (6th ed.), 245.

GRAVES, J.

Linabury sued Gibbs before a Justice and declared upon a note of the following tenor:

["$120 00.]                                    [AVON, Nov. 3d, 1869.]

On or before the first day of August, 1870, for value received, [I] promise to pay to Clark & Brooks, or bearer, [one hundred and twenty] dollars, with use, payable at [First National Bank in Pontiac.]

G. G.
10 cent
stamp.
Nov. 3,
1869.

                                              GRAHAM GIBBS."

The defendant pleaded the general issue, and filed an affidavit denying the execution of the note. On the trial before the Justice both parties were examined as witnesses, and judgment passed against Gibbs and he appealed.

When the cause was tried in the Circuit Court the plaintiff first called Gibbs as a witness to prove his signature to the note, and he stated that the signature resembled his handwriting, but that he could not swear that it was his. On being asked if he remembered what he testified to before the Justice he replied that he then testified as in the Circuit.

The plaintiff then took the stand as a witness in his own behalf, and, after stating that he heard Gibbs testify before the Justice, was asked what he there testified to in

relation to the signature to the note, which was objected to by Gibbs' counsel, on the ground that the plaintiff had made Gibbs his own witness, and therefore he could not contradict or impeach him. The objection was overruled and defendant excepted. This ruling was right. The objection was based on the erroneous assumption that the object was to impeach Gibbs; but the manifest purpose was to prove a fact by one witness which the party had unexpectedly found himself unable to prove by another. The question was whether the name "Graham Gibbs," appearing on the supposed note, was in defendant's handwriting or not, and the defendant having stated that he could not swear that it was, the plaintiff sought to prove the fact in another way, namely, by admission of the defendant in his testimony before the Justice. This was competent.—§§ *442, 443, 444, 1st Greenleaf's Ev.,* and authorities there cited.

The plaintiff then narrated the substance of Gibbs' testimony before the Justice, and his explanation of the circumstances which attended the signing of the note, if, in fact it was signed by Gibbs, and this relation was substantially the same as that afterwards given by Gibbs on the stand. The plaintiff having testified, he offered the note in evidence, which was objected to on the ground that its execution had not been sufficiently proved. This objection raised two points: First, that the evidence of handwriting was insufficient, and second, that the circumstances shown by plaintiff to have attended the concoction of the paper, in contemplation of law disproved the execution. As to the first point, it is enough to say that there was some evidence before the jury tending to show that the name appearing on the paper was in the handwriting of defendant. Whether it was sufficient, was a question for the jury and not for the court.

The second point is involved in the main question in

22 mich.—61.

the case, and will be disposed of when that question is considered. In any view, however, of the point itself, it would have been improper to have excluded the note, since the proper determination of the ground of the objection required the action of the jury upon the facts.

It was not questioned but that the plaintiff acquired the note in good faith before maturity, and ,paid a valuable consideration for it.

The defendant testified in his own behalf that he was a farmer in Troy; Oakland County, where he had lived some twenty years; that on the 3d of November, 1869, a stranger, whose name afterwards appeared to be Brooks, called upon him in the field where he was at work, and stated that he had a patent hay-fork he desired him to look -at; that he replied that he did not want the fork; that Brooks then said that he did not want defendant to buy, but wished to make him an agent for the sale of the fork; that he, defendant, stated that he thought the forks could not be sold, there had been so many around; that Brooks then wanted defendant to go and look at the article, and he accordingly went with Brooks to the barn, where they tried the fork; that defendant then declared that he did not want it; that Brooks then said that he would make defendant an agent for the sale of the implement; that it would not cost him anything; that he, defendant, would have nothing to pay unless he sold the forks, and that he, defendant, could not in any event be made liable except for forks sold; that defendant and Brooks then went to defendant's house, where an associate of Brooks appeared, whose name defendant afterwards learned was Hurlburt; that defendant and Brooks then had some further talk in the same strain, when defendant agreed to take the agency on the terms specified; that it was then quite late in the afternoon, and "getting duskish," in the language of the witness, and Brooks took out

some papers and filled some up, when defendant took one
and stepped to the door, where could see to read, and read
it over; that Brooks read another as defendant looked at
his to compare, and they appeared, on such reading, to be
alike; that when Brooks read the sum $120 in the
paper, defendant asked him what that was put in for, to
to which Brooks answered that it was to show what was
going to manufacturers after a certain number were sold;
that Brooks held the papers, of which there were some
twenty or thirty, one above another, except that one which
defendant took; that after comparing the papers as before
stated, defendant and Brooks went back to the table, and
the latter then laid the papers down, one on top of the
other; that defendant did not take or look at the third
paper in Brooks' hands, but Brooks said it was just like
the others; that in placing the papers on the table, Brooks
shoved one paper over the other just far enough to leave
space at the bottoms for signing, and pointed to the spaces
and told defendant to sign there; that at this table it was
so dark that defendant could not see where to write his
name, except as directed by Brooks, and could not see well
enough to read any thing there, and (could only distinguish
the dark lines of the printing and writing from the light
color of the paper, and could not read anything there), not
even his own signature; that his eye-sight had been defect-
ive for some years; that after he, defendant, had signed his
his name *three times* in the places pointed out by Brooks,
the latter left one paper with him, and took the others and
went away; that Brooks left a fork with defendant, and
that he had never seen or heard of Brooks after that inter-
view; that he did not sign any paper then, except as the
contracts referred to; that nothing was said about a note
during the whole time, nor did he sign, nor was he

requested to sign, any paper as such; that if the signature to the paper read in evidence as a note was his, it was obtained as before stated; the defendant then produced the paper left with him by Brooks, which was read in evidence. It purported to be a commission empowering defendant to act as an agent in selling forks, and was a printed blank filled up by writing.

On his cross-examination the defendant stated that he was induced to sign the papers upon Brooks' representations that they were all like the contract he had compared; that relying upon these representations, he signed them; that the papers with his signature to them were taken by Brooks with his knowledge and consent; that he, defendant, was fifty-two years old; that his eyesight was pretty good—good enough so that he could see to do ordinary business without glasses.

It appeared that the letters "G. G." and the date on the stamp on the note were not in same handwriting or ink as the name of defendant, or as that in the filling up of the papers; that the name "Clark & Brooks" as signed to contract was not in the same ink as that in the filling up of the note or contract; that the note was upon a printed blank of which all the words were printed except those in brackets.

The court directed the jury that if Brooks obtained the signature of the defendant to the paper, just as claimed by defendant, the latter signing—supposing he was signing a contract and not a note, and delivered the paper to Brooks, it made no difference whether the paper so signed was at the time a blank note or filled up as a note, if the signature was the handwriting of defendant, and the plaintiff was an innocent purchaser for a valuable consideration, and before maturity, the plaintiff was entitled to recover. The

requests of defendant, which were in accordance with the doctrine declared in *Foster v. Mackinnon* and *Whitney v. Snyder*, hereafter referred to, were refused.

In the case of *Burson v. Huntington*, recently decided in this court [*21 Mich.*, *415*], the right of a *bona-fide* holder for value to recover upon what purported on its face to be a valid promissory note, but which had been tortiously obtained from the apparent maker and put in circulation, was very fully considered. In that case, however, the paper had never been delivered for any purpose, or as an instrument of any kind. It was in course of preparation with the view of being delivered, when finished, to the party who wrongfully seized and negotiated it, but was taken against the will of the maker, and behind his back, while he was absent to procure another name to it in order to complete it for the purpose it was designed to meet. It was still unfinished when taken, and there were no circumstances which gave the taker any right to it, or which would have precluded the maker from exercising the right to retain or destroy it with or without the additional signature, which was not obtained.

In the present case it must be assumed that the defendant intended to deliver, and did deliver, with his name upon it, the piece of paper which is now produced as a note, although he may never have been aware that the paper was a negotiable instrument, or contained any agreement for the payment of money, but honestly supposed, and had reason to suppose, that it was a mere duplicate or triplicate of the instrument which Brooks left with him. It is therefore seen that the two cases are broadly distinguishable.

Can the defense set up in this case be supported by the rules of law? We have been referred to two very recent cases, in which the precise point here presented was explicitly passed upon and ruled for the defense, and in

each of these cases the facts relied upon to defeat a recovery were no more cogent than those presented for the defense on this record; and in the leading case the matter of the defense was less persuasive than that shown by Gibbs.

The first case is that of *Foster v. Mackinnon* in the English Common Pleas, decided in July, 1869. The case was ably argued, and the judgment, upon full deliberation, received the concurrence of the four judges then present. The action was by the indorsee against the defendant, as indorser of a bill of exchange. The plaintiff was a holder for value before maturity and without notice of any fraud. According to the evidence of one Callow, who was acceptor of the bill, he produced the bill to the defendant, who was advanced in life, for him to put his signature on the back after that of one Cooper, who was the payee and first indorser, Callow not saying that it was a bill, and telling the defendant that the instrument was a guarantee. The defendant did not see the face of the bill at all. But it was *of the usual shape, and bore a stamp, the impress of which was visible at the back of the bill.* Callow also testified that the defendant, believing that the document was only a guarantee, then signed his name after Cooper's.

The Chief Justice instructed the jury that, if the defendant's signature was obtained upon a fraudulent representation that it was a guarantee, and the defendant signed it without knowing that it was a bill and under the belief that it was a guarantee, and if the defendant *was not guilty* of any *negligence* in so signing the paper, the defendant was entitled to the verdict.

The jury having found for the defendant under this direction, a rule was obtained for a new trial upon two grounds:

First, misdirection in point of law; and secondly, on the

ground that the verdict was against the evidence. The court decided that the instruction was right, but awarded a new trial on the second ground, namely, that the verdict was against the evidence. In the course of the judgment the court say: "The case presented by the defendant is that he never made the contract declared on; that he never saw the face of the bill; that the purport of the contract was fraudulently misdescribed to him; that when he signed one thing he was told and believed that he was signing another and an entirely different thing; and that his mind never went with his act. It seems plain on principle and authority that, if a blind man, or a man who cannot read, or who, for some reason (not implying negligence) forbears to read, has a written contract falsely read over to him, the reader misreading to such a degree that the written contract is of a *nature* altogether different from the contract pretended to be read from the paper which the blind or illiterate man afterwards signs; then, at least if *there be* no *negligence*, the signature so obtained is of no force. And it is invalid, not merely on the ground of fraud, where fraud exists, but on the ground that the mind of the signer did not accompany the signature. In other words, that he never intended to sign, and therefore, in contemplation of law never did sign, the contract to which his name is appended." After referring to the doctrine applicable to deeds falsely misread to blind or illiterate persons, in consequence of which the signers are not bound, the court further say: "The principle is equally applicable to other written contracts. Nevertheless, this principle when applied to negotiable instruments, must be, and is, limited in its application. These instruments are not only assignable, but they form part of the currency of the country. A qualification of the general rule is necessary to protect innocent transferees for value. If, therefore, a man write his name across the back

of a blank bill, stamp and part with it, and the paper is afterwards improperly filled up, he is liable as indorser. If he write it across the face of the bill, he is liable as acceptor, where the instrument has once passed into the hands of an innocent indorsee for value before maturity, and liable to the extent of any sum which the stamp will cover.

" In *these cases, however, the party signing knows what he is doing ; the indorser intended to indorse, and the acceptor intended to accept, a bill of exchange,* to be thereafter filled up, leaving the amounts, the date, the maturity, and the other parties to the bill undetermined. *But in the case now under consideration, the defendant, according to the evidence, if believed,* and the finding of the jury, never intended to indorse a *bill of exchange at all,* but *intended to sign a contract of an entirely different nature.* It was not his design, *and, if he was guilty of no negligence,* it was not *even his fault* that the *instrument he signed* turned out to be a bill of exchange. It was as if he had written his name on a sheet of paper for the purpose of franking a letter, or in a lady's album, or on an order for admission to the Temple Church, or on *the fly leaf of a book,* and there had already been, without his knowledge, a bill of exchange or a promissory note payable to order inscribed on the other side of the paper. To make the case clearer, suppose the bill or note on the other side of the paper in each of these cases, to be written at a time subsequent to the signature, then the fraudulent misapplication of that genuine signature to a different purpose would have been a counterfeit alteration of a writing with intent to defraud, and would therefore have amounted to a forgery. In *that case* the signer would not have been bound by his signature, for two reasons : first, that he never in fact signed the writing declared on, and secondly, that he never intended to sign any such contract.

" In the present case, the first reason does not apply, but the second does apply. The defendant never intended to sign that contract or *any such contract*. He never *intended to put his name* to any instrument that then was, or thereafter might become negotiable. He was deceived, not merely as to the legal effect, but as to the actual contents of the instrument."

The case of *Ingham v. Primrose*, 7 *C. B. N. S. 82* (*Vol. 97, E. C. L.*), and *Nance v. Lary, 5 Ala., 370*, were referred to as standing on different facts. The case of *Putnam v. Sullivan, 4 Mass., 45*, was also noticed on account of the distinction there suggested between a case where an indorser intended to indorse such a note as he actually did indorse, though induced thereto by fraud, and a case where he designed to indorse a different note and for a different purpose.

The other case in point before alluded to, of *Whitney v. Snyder* was decided a few months since by the Supreme Court of New York for the fourth department, and has not yet appeared in the reports.

There, the plaintiff having shown that he purchased the note for value and before maturity, the defendant offered to prove in defense that he was unable to read, and that when he signed the note it was represented to him, and he believed that it was, a certain other contract, offered to be also produced in evidence, and which purported to be a contract *inter partes* of an entirely different character.

The offer was rejected, and the defendant moved for a new trial on exceptions. The court referred to and followed *Foster v. Mackinnon*. In the course of the opinion the court noticed the peculiar protection accorded to *bona-fide* holders of commercial paper acquired before maturity for value, and added: "But in all these cases the party intended to sign and put in circulation the instrument as a negotiable security. When this is the case, he is bound to

know that he is furnishing the means whereby third parties may be deceived, and innocently led to part with their property on the faith of his signature and in ignorance of the true state of facts. But, while this is a rule of great convenience and propriety, there are and must be some limits to its application,—some defenses as to which even a *bona-fide* purchaser purchases at his peril."—*Law Journal for January, 1871, page 3.*

It is conceded that these cases are in point, and that they are opposed to the ruling of the judge at the trial. But their authority is questioned, and it is urged that they conflict with other well-considered cases. The defendant in error claims that the late case of *Clark v. Johnson* in the Supreme Court of Illinois and not yet reported, is distinctly the other way, and that the maxim that when one of two innocent persons must suffer by the acts of a third, the loss must be borne by the party who enables such third person to occasion it, was not brought into view and applied as it should have been.

We have not seen the Illinois case to which reference is made, but if we accept the statement of it contained in the brief of defendant in error, it is quite distinguishable in substance from the present case, and bears a close resemblance to that of *Burson v. Huntington*; and if this be so, then the decision is at variance with our own.

The English court failed to discover any case where the precise point had been directly adjudged, and the New York court was unable to find any distinct authority except the English case. On the argument before us the counsel failed to cite any clearly adjudged case in conflict with these on the very question there and here involved, and we have not succeeded in discovering any. It is true, that opposing *dicta* may be found, but they cannot be allowed to outweigh the clear and elaborate judgments in the two

cases mentioned upon the precise question requiring to be settled. It is admitted that no express mention was made, either in the English or New York court, of the maxim suggested, but we may not infer from this that it escaped the minds of court and counsel. We have it on the authority of an English judge that the principle is applied almost daily in Westminster Hall, and we know very well that the New York courts frequently invoke it. If the argument in favor of its employment as an answer to the defense here is tenable, it cannot be imagined that it was forgotten by the eminent counsel and learned judges who took part in the two cases in question. We may, therefore, infer that it was deemed inapplicable to the circumstances of those cases. In the opinion in *Burson v. Huntington,* we expressed our view of the principle embodied in the maxim, and adverted to the necessity for caution in applying it. My brother Christiancy then pointed out many of the settled exceptions to the rule, and suggested limits to its operation in other cases, standing on the clearest reasons. No position was there taken which would require us to apply the maxim against the point made here by the plaintiff in error.

A complete exposition of the rule with its necessary exceptions and limitations would require a volume, and no one can fail to see the danger which would follow an attempt to define its sense and scope in a few paragraphs. It is certainly a rule of justice, and not of injustice. It supposes some kind of action by one, which in some way is calculated to involve another in loss through the improper behavior of a third. It supposes such action to have proceeded from intelligence, for the action of a lunatic can furnish no ground for its application, whatever may be the appearances or the consequences. It supposes liberty in the party to do or omit to do the act leading to the final

loss, since it would be manifestly absurd and unjust to hold that one compelled by duress to act in a particular manner, had *enabled* some other by such compelled act to wrong a third. It would therefore seem that the act which may involve a man in consequences under the operation of this maxim must have the assent of the will of the actor.

Now, when a party never designed to put or cause to be put any sort of negotiable paper in circulation, when the thought of doing so never entered his mind, when he has never bargained to do so, when he has never consciously been privy to any attempt to set such paper afloat, how can it be said that his will in any way assented to the concoction of such a contract so as to make him an object of the rule?

So far as this principle is concerned, it is not perceived how the instance here supposed would differ from that when the act leading to the mischief is done by an insane man, or is compelled by duress. The point is that the will does not go with the act. If the man is insane, there is no intelligent will to be exercised, and therefore there is no assent. If the act be compelled by duress, the will is shackled and does not act, and hence there is no assent. But if without these it be admitted that the will did not assent, the result must be the same. Without dwelling farther on this topic, we think that the maxim has no proper application to the question raised on this bill of exceptions.

Excluding the application of this principle as inappropriate, we come to the other rules which relate to the rights of parties to negotiable paper, and on this aspect of the case we assent to the doctrine so forcibly stated in *Foster v. Mackinnon* and *Whitney v. Snyder*, so far as it relates to the point under review, and are, therefore, of

the opinion that the refusal to submit the case to the jury as requested by the plaintiff in error, was erroneous, and that the judgment should be reversed with costs and a new trial ordered.

The other Justices concurred.