HULETT v. MARINE SAVINGS BANK.

CANCELLATION OF INSTRUMENTS — PROMISSORY NOTES — FRAUD —
NEGLIGENCE—ESTOPPEL.

> On a bill to cancel certain promissory notes on the ground of
> fraud in their procurement, evidence examined, and *held*,
> that complainants were not estopped from setting up their
> defense to the notes by their negligence in allowing them-
> selves to be tricked into signing the notes without reading
> them, believing them to be a contract imposing no obligation
> upon them without further action.

Appeal from Grand Traverse; Mayne, J. Submitted
January 30, 1906. (Docket No. 71.) Decided March 5,
1906.

Bill by Byron Hulett and others against the Marine
Savings Bank, Margaret Lyons, and others to cancel and
restrain the collection of certain promissory notes. From
a decree for complainants, defendants Marine Savings
Bank and Lyons appeal. Affirmed.

The 12 complainants filed this bill to restrain the col-
lection and negotiation and secure the cancellation of three
promissory notes for $800 each, signed by them, on the
ground that their signatures had been obtained by fraud,
misrepresentation, and without consideration; that they
did not sign them knowing that they were promissory
notes; that they signed them on the representation by
those who procured them that they were merely a prelim-
inary contract of which they formed a part, and from
which they have been separated so as to form three prom-
issory notes. The active participants in the fraud were
alleged to be the defendants John and Titus Lyons, D. C.
Smith, and Harvey G. Wilson. The Marine Savings
Bank was made defendant as claiming to be the holder of

the notes, and the Bank of Kingsley was made the defendant, as the custodian thereof. The Marine Savings Bank claims to be the bona fide owner and holder of the notes. The Bank of Kingsley is the mere custodian, and has no interest in the matter. Defendant Margaret Lyons was not made a party to the original bill, but was subsequently made a party as the one who had given her own note to the Marine Savings Bank for $1,400 to which as collateral security the notes in dispute had been assigned. The defendants the Marine Savings Bank and Margaret Lyons alone answered and made defense. Decree was entered for the complainants upon pleadings and proofs taken in open court.

In September, 1903, defendant John Lyons, who with his wife then lived in Marine City, owned a stallion, which he testified had cost him about $600, and which he had owned for about six months. He had made one attempt to syndicate the animal. By "syndicating" is meant the organization of a corporation, issuing stock to the individual incorporators, and when the transaction is completed the title to the animal is transferred to the corporation. Defendants Wilson and Smith, who up to that time were strangers to Lyons, made an arrangement with him to syndicate the animal for $2,400; and after payment of expenses, which were not to exceed $400, the money was to be divided between them. Smith and Wilson went to the township of Kingsley, Grand Traverse county, and there undertook to form a syndicate of farmers. The plan was to get 12 stockholders each to put in $200, and receive his certificate of stock for that amount. Smith and Wilson prepared the papers with which to approach the complainants. They first went to the complainant Fenstermacher and with Fenstermacher to complainant Hulett. Fenstermacher and Hulett, at the request of Smith and Wilson, went with them and introduced them to other complainants. The claim of the complainants is that Smith and Wilson represented to them that the papers they were signing were merely a

contract agreeing to get together, form a syndicate or corporation, and each then to pay cash $200 or give his note therefor, and purchase the stallion; that no money obligation was incurred by the papers they signed; and that they were to meet at a certain place and time, inspect the stallion, and then complete the arrangement if they were satisfied. All testified that the papers they signed were attached and were a part of one and the same contract. The complainants signed them usually in the field or on the highway, and did not have the papers spread out before them. Their testimony is that Wilson held the paper sometimes upon his knee, and always with the papers so covered that only the signatures could be seen. It appears that four papers were in fact signed,—one reading as follows:

"Milt Henry, No. 5180. [Name of Stallion.] John Lyons and Harvey G. Wilson, agree to sell the above-named stallion for $2,400 to the other undersigned subscriber, who, wishing to improve their stock, agree to pay John Lyons, Harvey G. Wilson, $200 for each share in said stallion. Capital stock, $2,400. No. shares, 12. Payment to be made cash; or one-third in one year, one-third in two years and one-third in three years, secured by notes, with interest. 1st payment September 14th, 1904; 2d payment September 14th, 1905; third payment September 14th, 1906. Lyons and Wilson."

Then follow the names of the complainants, each subscribing for one share. The notes attached thereto read as follows:

"On September 14th, 1904, after date, for value received, I promise to pay to the order of Harvey G. Wilson and John Lyons, eight hundred dollars, at the Bank of Kingsley, Michigan, with interest at six per cent. payable annually." [Signed by all the complainants.]

All the complainants testified that Wilson and Smith assured them that the papers signed were merely a part of one contract, and that they signed them without any idea that they were signing promissory notes. About the time that Smith and Wilson commenced their syndicate opera-

tion in Kingsley township, the stallion was shipped to Kingsley and placed in the stable of complainant Fenstermacher who kept a livery, and was put in a box stall, under lock and key, under the exclusive control of Smith and Wilson. The animal was in fact defective, and was of little worth. The representations of Smith and Wilson as to the condition and value of the stallion were false. When Smith and Wilson had secured the 12 signatures, they telegraphed defendant John Lyons to come to Kingsley and complete the arrangement. That was the day fixed for the meeting of the subscribers to form a corporation and to complete the preliminary agreement as they understood it, and as it had been represented to them by Smith and Wilson. Mr. Lyons arrived at Kingsley about 12 noon on Friday. The meeting of the stockholders was to take place that afternoon. Wilson had the notes, and he and Lyons hired a livery and drove 14 miles to Traverse City, instead of taking the cars. Took the train for Marine City, and there disposed of the notes on the following Monday, in the manner hereinafter stated. Meanwhile, the subscribers met, Mr. Wilson had flown, though he had agreed to meet them. The stallion was then brought out from the stable, and his defects disclosed. Mr. Smith who was then present, informed them that they had executed promissory notes; that Wilson had taken them and gone; that they were probably negotiated before then; threw down the key to the stall where the stallion was kept, and departed. On arriving at Marine City on Saturday, Lyons and Wilson took the notes to the Marine Savings Bank, and offered them to Mr. Carmon, the cashier, at a discount. Mr. Carmon refused to take them, and told him that if the defendant Mrs. Lyons would indorse them they would cash them. It was finally arranged that Mrs. Lyons was to give her note for $1,400, and these notes should be left with the bank as collateral. The entire arrangement was made with Mr. Lyons, and for his benefit, except he testified it was understood that when these notes were

collected, the balance over and above what was due the bank was to be applied to an indebtedness of Mrs. Lyons. Mrs. Lyons never had possession of the notes. After Mr. Lyons had consummated the arrangement at the bank, Mr. Saph, one of the directors, went to the hotel kept by Mr. Lyons, secured Mrs. Lyons' signature to the note for $1,400, paid her the cash. She immediately returned it to him. He took it back to the bank, and Mr. Wilson and Mr. Lyons disposed of it according to their previous arrangement. The complainants immediately filed this bill of complaint.

*Pratt & Davis*, for complainants.

*John W. Patchin*, for defendant Lyons.

*Avery & Walsh*, for defendant Marine Savings Bank.

GRANT, J. (*after stating the facts*). That a gross fraud was perpetrated upon the complainants is fully established by the evidence. No one disputes their version of the representations made to them by Smith and Wilson, and the manner in which their signatures were obtained. Smith and Wilson were not produced by the defendants as witnesses. Their absence is unaccounted for. Probably, like all criminal birds of passage, they had flown. Complainants were induced to sign written instruments which were a part of one contract, or were so attached as to appear so, but were afterwards separated so as to appear valid promissory notes. Smith and Wilson resorted to representations and devices to prevent the papers being read by the complainants before signing, and while they were signing arranged to cover the written and printed parts above so that they should not be observed by the signers. It is not easy to determine the mysterious manner in which these signatures were obtained without the signers obtaining information of just what they were signing. Criminals of this sort always work in mysterious ways, and resort to methods and schemes often difficult to

understand. They are undoubtedly familiar with the decisions of the courts on papers obtained by fraud, and practice the greatest ingenuity and shrewdness to avoid the decisions, and to enable purchasers to say that they obtained them in good faith.

The scheme, as represented to the complainants under their testimony, was reasonable. Twelve men were required to constitute the syndicate or organization. No one of the 12 knew anything about the stallion. Only one, Fenstermacher, ever had seen him. Smith and Wilson were strangers to them. If their representations as to the character, quality, and value of the horse were true, each was willing to put in $200 in the purchase of the stock of the syndicate. If 12 such men were found they were then to meet, examine the horse, and if found as represented they would then form the syndicate, take the stock and purchase the horse. The scheme as found in the agreement and notes is utterly unreasonable, and it is difficult to conceive that even the most ignorant and unwary would knowingly make such an agreement. Persons of even less than average common sense do not buy property without seeing it, especially from total strangers, and that a piece of property of so much greater value than usual. Besides, it is altogether improbable that these men would have signed a note on which each was individually liable for the whole amount. The object of the conspirators was to prevent the examination of the property and the instruments they were signing, and to secure the names of the complainants to promissory notes which they could dispose of as such. We are not so concerned with the mysterious methods by which this was accomplished as we are by the fact that it was accomplished. The defense is good unless complainants are estopped to assert it by their own gross negligence. The law governing such transactions is well settled by the decisions of this and other courts. The only difficulty arises in applying the law to the facts of the particular case. The first case upon this subject in this court is *Gibbs* v. *Linabury*, 22

Mich. 479, wherein the court quoted with approval the English case of *Foster* v. *Mackinnon*, L. R. 4 C. P. 704, in which it was said:

" The defendant never intended to sign that contract [a bill of exchange] or any such contract. He never intended to put his name to any instrument that then was or thereafter might become negotiable. He was deceived, not merely as to the legal effect, but as to the actual contents of the instrument."

This court in that case where three papers were signed said:

" Now, when a party never designed to put or cause to be put any sort of negotiable paper in circulation, when the thought of doing so never entered his mind, when he has never bargained to do so, when he has never consciously been privy to any attempt to set such paper afloat, how can it be said that his will in any way assented to the concoction of such a contract so as to make him an object of the rule ? "

In *Anderson* v. *Walter*, 34 Mich. 113, the defendant signed two papers which he had only heard read, and neither was a note. The court say:

" No man has a right to suppose that a crime is about to be committed, or that he is going to be defrauded by having a paper of an entirely different tenor substituted in the place of one he has just heard read and is about to sign, nor that a negotiable promissory note will be lurking in the depths of an instrument like those referred to. And he is not therefore required to take any steps to guard against such a contingency."

In *Soper* v. *Peck*, 51 Mich. 563, the court, speaking through Justice COOLEY, said:

" It cannot be disputed that defendants' evidence tended to show that he had had a fraud practiced upon him and that very probably he had been made to put his name to a note when he supposed he was signing something different. If the jury believed this he was entitled to their verdict, unless his negligence was so gross as to preclude his making the defense as against a bona fide purchaser of the paper."

It is true that there are some discrepancies in the testimony of the witnesses who were subjected to a rigid cross-examination. One testified that he read the papers, but he also testified that the papers produced were not like the ones that he signed. The learned circuit judge found that the representations testified to by complainants were made by Smith and Wilson; that they were deceived thereby; that the papers were not what Smith and Wilson represented them to be; and that they were free from such negligence as would bar their defense. We think his conclusions in this respect were correct. Mr. Lyons was not a witness for the defendants, but was called in rebuttal by the complainants. Smith and Wilson were acting for him as he testified, and he is responsible for their acts. Mrs. Lyons was the mere willing stool pigeon for her husband, or the conduit through which he and Wilson succeeded in making the arrangement with the bank. He testified:

"I arranged with Mr. Carmon [the cashier] in my second interview that he would let me have $1,400, that I would have to have my wife sign a note to that amount, and to turn over these notes as collateral."

She is financially responsible. The bank is not the absolute owner of the notes. They were taken simply as collateral. It is quite probable that Mrs. Lyons and Mr. Wilson, finding that the bank would not purchase the notes with their indorsement, and having been unable to dispose of them at Kingsley, resorted to the scheme of getting them into the hands of the bank as collateral, hoping in this way to make the bank bona fide holder. Mrs. Lyons is not a bona fide holder. The notes were never assigned to her. She never had them in her possession or control. She knew of the alleged sale of the stallion to the farmers. She was connected in the livery business with her husband; he owning some of the horses and she others.

It is unnecessary to determine the doubtful question

whether the bank is a bona fide holder.    Mr. Carmon (its cashier) was cognizant of several things which might be held to put a reasonably prudent man upon inquiry.    But the bank cannot suffer.    Mrs. Lyons is financially responsible, and the bank only holds the notes as collateral security.    It is urged that Fenstermacher and Hulett were as active in procuring the signatures of the other complainants as were Smith and Wilson, and that they were as guilty of fraud practiced upon the others as were Smith and Wilson.    It is true that they went around with Smith and Wilson to see other parties; that Fenstermacher took them around with a team from his livery.    We find no evidence that they participated in the false representations, or that they themselves knew or had good reason to know that the representations were false and fraudulent.

We think the decree of the court was correct, and it is affirmed, with costs.

McALVAY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.