SAGINAW MEDICINE CO. v. BATEY.

1. PRINCIPAL AND SURETY—CONTRACTS—AGENCY—FRAUD.

Evidence that plaintiff's salesman was required by it to obtain a guaranty signed by two sureties before it would ship goods to him, that in procuring two guarantors he made fraudulent representations as to the effect of the paper, which the defendant sureties claimed they did not examine, that the principal procured his goods of the plaintiff and acted as salesman on his own behalf, not

as agent of the plaintiff, although the instrument recited that plaintiff paid the sum of one dollar as consideration for the execution of the guaranty, *held*, not sufficient to establish an agency such as to charge the company for his frand.[1]

2. SAME—FRAUD.

Even though sureties have been misled by the principal at whose request a bond or guaranty was executed, as to the character and extent of the obligation, the fact is not a defense to an action on the instrument unless it is made to appear that the plaintiff was a party to the fraud practiced upon defendants.

3. SAME—GUARANTY.

It is not the duty of the obligee to seek out the sureties and explain to them the nature of their undertaking; it is for them to ascertain for themselves.

4. SAME—ACCEPTANCE—NOTICE.

Where plaintiff sent a letter to each of the guarantors stating that it had accepted the contract in which their names appeared as guarantors, the defense that they were misled as to the character of the guaranty and paid no attention to the letters, was insufficient as matter of law.

Error to Ionia; Davis, J. Submitted January 27, 1914. (Docket No. 101.) Decided March 27, 1914.

Assumpsit by the Saginaw Medicine Company against Joseph Batey and Jock Ruegseggar on a contract of guaranty. Judgment for defendants. Plaintiff brings error. Reversed.

*Hatch, McAllister & Raymond,* for appellant.

*Powers & Shivel (E. M. Davis,* of counsel), for appellees.

MOORE, J. Plaintiff is a corporation located at Saginaw, and engaged in the business of manufacturing and selling household remedies, extracts, spices, toilet

[1] The question of the liability on a guaranty or surety obligation obtained by fraud is treated in a note in 21 L. R. A. 409.

articles, etc. The manager is Frank D. McConnon. Prior to April, 1910, the plaintiff sold goods to one John R. Credit, who in turn peddled them in Ionia county. One George W. McLean assisted Mr. Credit for a week or two, and finally arranged to buy him out. This fact was communicated by Mr. Credit to the plaintiff company. As the result of this communication a contract was sent to Mr. McLean for him to execute, inclosed in a letter reading as follows:

"March 19th, 1910.

"MR. G. W. MCLEAN,
        "Belding, Mich.
"*Dear Sir:*
   "We have your kind favor of March 18th, and we are pleased to have same. We are inclosing our contract for Ionia Co. as you requested and we hope you will have same executed promptly as it requires some time to get all matters adjusted properly before goods will be shipped to you, consequently we advise you to give the matter your prompt attention and return the contract properly executed soon as possible.

   "This contract must be signed in ink by yourself and two responsible men before two witnesses. Kindly sign your full name on line directly beneath the signature of Louis Smith, Secretary. Your guarantors will kindly sign on back of contract on lines indicated. Witnesses should sign names and give post office address on lines indicated.

   "When you send contract give names and addresses of your guarantors and all the information you can concerning their holdings, also state in what county or counties their holdings are located. Guarantors to be acceptable to us must be honest and reliable and have holdings over and above their debts and exemptions.

   "The guarantee on this contract is a warranty of your good faith; no more, no less. It is a plain surety that we will receive, finally, the payment of the goods we advance to you.

   "We do not divulge prices until the contract has been accepted, thereby protecting our salesmen from those who write to us out of curiosity. If after contract is accepted the prices are not satisfactory, we

do not ask you to do any work or order any goods.

"We will be pleased to explain anything in this agreement you do not understand. Be careful in executing this contract for mistakes only cause delay in accepting.

"Thanking you for this favor and hoping to receive your contract by return mail, we are,

"Very truly yours,
"SAGINAW MEDICINE COMPANY."

The contract which was inclosed was signed by Mr. McLean and the defendants and returned to the plaintiff company. The arrangement made between Mr. Credit and McLean provided for the assumption by the latter of a debt Mr. Credit owed the plaintiff. In this contract nothing was said about Mr. McLean's paying to the plaintiff the debt which Mr. Credit owed it. The contract, for that reason, was returned to Mr. McLean and a new one was sent him to be executed and returned. Signatures were obtained to this contract, and when it was returned to the plaintiff it read as follows:

"This agreement made this fourth day of April, A. D. 1910, between the Saginaw Medicine Company, a corporation of Saginaw, Michigan, party of the first part, and George W. McLean of Belding in the State of Michigan party of the second part, witnesseth, that for and in consideration of the promises and agreements hereinafter contained, to be kept and performed by the party of the second part, the party of the first part promises and agrees to sell and deliver to the party of the second part f. o. b. at Saginaw, Michigan, in such reasonable quantities as the party of the second part may from time to time require in his territory hereinafter described, all medicines, extracts, and other articles manufactured or sold by it, such goods to be sold and delivered to the party of the second part at the usual and customary wholesale prices at which the same are sold and delivered by the party of the first part in other similar territories, such prices to be shown by invoices accompanying each shipment.

"The party of the second part hereby acknowledges that he is indebted to the party of the first part in the sum of three hundred fifteen dollars, the same being the balance now due from John R. Credit to the party of the first part under a certain agreement entered into between him and it on April 16th, 1908, which indebtedness the party of the second part hereby assumes and agrees to pay on or before the expiration of this contract in consideration of the execution of this agreement and the extension of the time of payment of said indebtedness by the party of the first part.

"The party of the second part agrees to sell goods delivered to him under this agreement in the county of Ionia, State of Michigan, or in such other territory as the party of the first part may direct, from the date hereof until the first day of March, 1911, when this agreement shall terminate.

"The party of the second part further agrees to keep a complete record of all goods disposed of in his said territory and on hand, and to make written reports of the same to the party of the first part at such times and in such manner as it may from time to time require, and to pay the party of the first part the wholesale price f. o. b. at Saginaw, Michigan, as aforesaid for all goods furnished to him from time to time as hereinbefore provided at the time and in the manner and in accordance with the provisions of the weekly report blanks of the party of the first part furnished to the party of the second part and further agrees that at the expiration of this agreement, he will pay to it the whole amount then remaining unpaid, but the time of making such payments or any of them may be extended by the party of the first part without notice to the guarantors hereon and without prejudice to the interests of said first party.

"In testimony whereof the party of the first part has caused this agreement to be executed in its corporate name by its secretary and its corporate seal to be hereunto affixed; and the said party of the second part has hereunto set his hand and seal, the day and year first above written.

"THE SAGINAW MEDICINE COMPANY,
"By LOUIS SMITH, Secretary.
"GEO. W. MCLEAN [Seal.] .

"In consideration of the sum of one dollar to us in hand paid by the Saginaw Medicine Company, the receipt whereof is hereby acknowledged, and the further consideration of the execution by it of the within agreement, the extension of the time of payment of the indebtedness therein mentioned, and the sale and delivery to the party of the second part of the medicines, extracts and other articles, as in said agreement provided, we, the undersigned, jointly and severally guarantee the full and complete payment of said indebtedness and all moneys now due and which may hereafter become due from the party of the second · part to the party of the first part, under and pursuant to the said within agreement, at the time and in the manner therein provided.

                        "JOE BATEY.          [Seal.]
                        "JOCK RUEGSEGGAR.    [Seal.]
"Witnesses:
        "MRS. JOE BATEY, Smyrna.
        "JACOB RUEGSEGGAR, Lowell."

After looking up the responsibility of the guarantors the following was sent to Mr. Batey:

                                "April 7th, 1910.
"JOSEPH BATEY,
        "Smyrna, Mich.
"*Dear Sir:*
"We are pleased to advise you we have accepted the contract of George W. McLean, Belding, Mich., on which your name appears as a guarantor.
"Trusting this is satisfactory to you, we are,
                        "Very truly yours,
                        "SAGINAW MEDICINE COMPANY."

Mr. Batey receipted for the letter as follows:

                "Registry Return Receipt.
"Received from the postmaster registered article, the original number of which appears on the reverse side of this card.
"Date of delivery April 9, 1910.
                                "JOSEPH BATEY."

A like letter was sent to the other defendant, who sent a like receipt. Plaintiff then began to sell goods to Mr. McLean. He did not pay for all of them, nor

did he pay the debt of Mr. Credit, which, after the receipt by the plaintiff of the contract from Mr. McLean and the guaranty, had been charged to Mr. McLean on the books of the company, and discharged thereon as to Mr. Credit. Several letters were written by the plaintiff to the defendants, to which no attention was paid until March 21, 1911, when Mrs. Batey wrote for her husband a letter, saying he had simply signed a recommend, closing with the words:

.   "You go to George McLean and see what he is doing. I haven't time to spare running after him.
"Yours respectfully,
"JOE BATEY, Smyrna."

May 29, 1912, this suit was begun by declaration, in which the contract and guaranty were set out in full and properly declared upon, followed by all the common counts in assumpsit. The defendants pleaded the general issue, but did not deny under oath the execution of the guaranty, but gave notice they would show the guaranty was procured by false representations and fraud. Mr. Batey claimed he was illiterate, and did not understand the words used in the contract and the letter sent to him later. The other defendant was born in Switzerland, and claimed he did not speak English well, and that what Mr. McLean said was explained to him by his 17-year old son, who also did not understand English or business very well. They both claimed they relied upon the statements of Mr. McLean, and that he made false statements to them as to what the contract contained. The case was tried before a jury, and from a verdict and judgment in favor of the defendants the case is brought here by writ of error.

The plaintiff preferred 13 written requests to charge. Among them was a request for a directed verdict for the plaintiff. There are 71 assignments.

179 MICH.—42.

of error, and counsel say they rely upon each of them. In our view of the case it will not be necessary to discuss many of them. We quote from the brief of counsel for appellant:

"(1) It was error for the circuit judge to allow the defendants to call George W. McLean as a witness claiming the benefit of Act 307 of the Public Acts of 1909. This was allowed, on the theory, as stated by the circuit judge, that McLean was plaintiff's agent. He certainly was not their agent in any sense of the term, any more than any independent contractor is the agent of the other party to the contract."

We will discuss this assignment of error and the question of whether there should have been a directed verdict together.

Mr. McLean was called by the defendants for cross-examination under the statute after the manager of the plaintiff had been sworn. The manager denied in emphatic terms that Mr. McLean was the agent of the plaintiff company, but he was very ingeniously and skillfully cross-examined. We quote some of the cross-examination:

"*Q.* Did you at that time send to Mr. McLean $1 to pay to either Batey or Ruegseggar?

"*A.* No, sir.

"*Q.* This says paid to the guarantors by the Saginaw Medicine Company. Did you pay a dollar or more to either Ruegseggar or Batey?

"*A.* No, sir; it wasn't necessary.

"*Mr. Hatch:* I object to these questions regarding the consideration, on the ground that they are incompetent, immaterial, and irrelevant.

"*The Court:* It may be received.

"*Mr. Hatch:* Take an exception.

"*Q.* Why is it you are reciting here the Saginaw Medicine Company has paid a dollar to the guarantors as a consideration for the guaranty?

"*A.* To make the contract legal.

"*Q.* Then it was for your benefit on the payment of a dollar by you of consideration—

"*A.* State that again.

"*Q.* It was for your benefit, this guaranty?

"*A.* Benefit in what way, to whom?

"*Q.* To protect you, it was a benefit to protect you if this man McLean didn't perform his contract?

"*A.* Yes, sir.

"*Q.* You were to pay the consideration and asked for a receipt of the consideration from you?

"*A.* Yes, sir.

"*Q.* For the payment of a dollar which is receipted here?

"*A.* Yes, sir.

"*Q.* By you to Ruegseggar and Batey?

"*A.* Yes, sir.

"*Q.* They guaranteed to pay you if he didn't?

"*A.* Yes, sir.

"*Q.* In what manner did you transmit to them that consideration?

"*A.* We didn't transmit it.

"*Q.* Did you send it to McLean?

"*A.* No, sir.

"*Q.* He was the man that took it to them, wasn't he?

"*A.* Yes, sir.

"*Q.* This recites it was received from you?

"*A.* Yes, sir.

"*Q.* He then was the only person that was acting for you in procuring this for your benefit?

"*A.* Come to think about it, you are getting on thin ice.

"*Q.* Is there any thin ice about this case?

"*A.* No, sir.

"*Q.* What are you worrying about?

"*A.* I don't hear clearly, I might misconstrue what you are telling me.   [Witness was very deaf.]

"*Q.* This man was acting for your benefit, then, in procuring this guaranty—this man McLean?

"*A.* I never considered it that way.

"*Q.* Why is it you recite in this contract 'paid by you,' isn't he the one that is carrying the consideration from you?

"*A.* Yes, sir.

"*Q.* Acting as your agent in doing it?

"*A.* Acting as salesman.

"*Q.* Was he selling anything at that time?

"*A.* No, sir.

"*Q.* He was acting as your agent in procuring this guaranty, wasn't he?

"*A.* He was acting of his own free will.

"*Q.* Certainly, but at your request.

"*A.* We will concede the point then.

"*Q.* At your request he made, procured for your benefit as your agent— At your request he might procure for your benefit as your agent, you not being there, that he would procure signers to this guaranty?

"*A.* Yes, sir; he procured the signers.

"*Q.* And as your agent in doing so?

"*A.* No, he never acted as our agent.

"*Q.* For whom was he acting then in paying $1 or any consideration to these people for the Saginaw Medicine Company?

"*A.* He was acting for himself.

"*Q.* Does it say so in the guaranty?

"*A.* No, sir.

"*Q.* It says in the guaranty he is acting for you, doesn't it?

"*A.* Yes, sir.

"*Q.* For the Saginaw Medicine Company.

"*A.* Yes, sir.

"*Q.* And you were the people that were to pay the money?

"*A.* Yes, sir.

"*Q.* That was the consideration for the execution of the guaranty?

"*A.* Yes, sir.

"*Q.* Then he was acting for you?

"*A.* I presume it could mean that.

"*Q.* That is exactly what it does mean.

"*A.* I will concede the point to you.

"*Q.* When you say, 'I will concede the point to you,' do you say it is true he was acting for you?

"*A.* No, sir.

"*Q.* How do you mean to qualify it? It says by the Saginaw Medicine Company, the money is paid by them?

"*A.* Let me explain myself. We don't concede that this man was acting for us in that respect because there is no obligation—

"*Q.* I understand now, I know what you concede and what you don't concede, I want to take you by your own recitals in your own paper here. If it had

been for his benefit, it would have been $1 paid by McLean, wouldn't it?

"*A.* Yes, sir.

"*Q.* And it says it was paid by you to them?

"*A.* Yes, sir.

"*Q.* He was acting as your agent in giving this paper to these people procuring signatures as guarantors?

"*A.* Yes, sir.

"*Q.* Then he was acting as your agent, wasn't he?

"*A.* Yes, according to that contention.

"*Q.* At the time you asked him to do that you transmitted to him this letter, Exhibit 7?

"*A.* Yes, sir."

On the re-direct examination the following occurred:

"*Q.* Did you have any understanding with McLean in regard to getting guarantors on this contract, except what is embodied in these articles that have been introduced in evidence?

"*A.* No, sir.

"*Q.* You gave him no instructions except what are contained in the letter of March 19, 1910?

"*A.* Yes, sir; that is all.

"*Q.* You gave him no instructions except what are contained in that?

"*A.* Yes, sir.

"*Q.* That is all?

"*A.* That is all.

"*Q.* You gave him no verbal instructions?

"*A.* No, sir.

"*Q.* No verbal understanding between you and him about getting guarantors?

"*A.* No, sir.

"*Q.* Whatever agreement or contract there was between you and him was embodied in these writings?

"*A.* Yes, sir.

"*Q.* Then when you stated in answer to Davis' question when he was reading from this guaranty, 'In consideration of the sum of one dollar to us in hand paid by the Saginaw Medicine Company,' in getting that guaranty he was acting as your agent, that depended upon the construction of that writing?

"*A.* Yes, sir.

"*Q.* That is what you meant by that?

"*A.* Yes, sir.

"*Q.* There is nothing else indicating agency except what is in the writing?

"*A.* No, sir."

This statement is not contradicted unless it can be said the cross-examination we have quoted is inconsistent with it.

We now quote from the appellees' brief. Counsel quote the cross-examination we have referred to somewhat more in detail than we have, and continue:

"Counsel say on page 2 of their brief, in speaking of Exhibit 7:

" 'There is nothing in that letter which would constitute McLean plaintiff's agent in procuring the guarantors.'

"This was a letter of instruction to McLean requesting him to get two guarantors to this contract. It reads:

" 'This contract must be signed in ink by yourself and two responsible men before two witnesses. * * * Your guarantors will kindly sign on back of contract on lines indicated. * * * Guarantors to be acceptable must be honest and reliable and have holdings over and above their debts and exemptions. * * * The guaranty on this contract is a warranty of your good faith; no more, no less.'

"We maintain that this refutes the argument in counsel's brief to the effect that McLean acted as an independent contractor, and did not represent the plaintiff in any way. We maintain that he was acting as an agent of the plaintiff in the procuring of this instrument, and Exhibit No. 7 was a letter of instruction to this effect. It authorized McLean to go out and tell the defendants that the contract he wished them to sign was nothing more than a warranty of his good faith, no more and no less. * * *

"We maintain that the fact that McLean was the agent of the plaintiff, its sending him out to procure this guaranty contract, which was for the benefit of the plaintiff, its sending him a letter of instruction containing this clause as above referred to, the non-disclosure on the part of the plaintiff of the execution

of the second contract, including the additional $315.00 liability—these facts bring these misrepresentations and fraud onto the plaintiff and connect it with them, and they are therefore binding upon the plaintiff."

The learned trial judge seems to have thought that this cross-examination and the clause quoted from the letter required him to hold that Mr. McLean in procuring the guaranty was the agent of the plaintiff, and he continued to so rule, though Mr. McLean swore at the very outset:

"*Q.* You went on the road for the Saginaw Medicine Company?

"*A.* I didn't go on the road for Saginaw Medicine Company; I went on the road for myself.

"*Q.* Got your medicines of them?

"*A.* I got my goods of them"

—and he was allowed to be cross-examined fully by defendants as to his procuring the guaranty, and after he had sworn he was acting for himself, and had stated truly to the defendants what the paper was, then the defendants, over the objection of plaintiff, were permitted to swear in detail that Mr. McLean had lied to them in procuring their signatures, and the jury were allowed to say whether such a fraud had been perpetrated upon them as to make the instrument a void one in the hands of the plaintiff.

Counsel cite the following cases as justifying the conduct of the trial: *Gibbs* v. *Linabury*, 22 Mich. 479 (7 Am. Rep. 675) ; *Anderson* v. *Walter*, 34 Mich. 113; *Soper* v. *Peck*, 51 Mich. 563 (17 N. W. 57) ; *Haughton* v. *Maurer*, 55 Mich. 323 (21 N. W. 426) ; *McGinn* v. *Tobey*, 62 Mich. 252 (28 N. W. 818, 4 Am. St. Rep. 848) ; *Waterbury* v. *Andrews*, 67 Mich. 281 (34 N. W. 575) ; *Busch* v. *Wilcox*, 82 Mich. 336 (47 N. W. 328, 21 Am. St. Rep. 563) ; *Reeder Bros. Shoe Co.* v. *Prylinski*, 102 Mich. 468 (60 N. W. 969) ; *Alfred Shrimpton & Sons* v. *Netzorg*, 104 Mich. 225 (62 N.

W. 343), and other cases. These cases have gone a long way in the effort to protect the illiterate and the credulous. Without stopping to analyze each of them it may be said that none of them is like the instant case. It is not claimed here that defendants did not intend to sign the paper which was presented to them, nor that there has been any substitution of papers, or that the signers did not sign the specific paper he or she intended to sign and in the place he intended. The nearest approach to such a contention was made by Mrs. Batey when she testified; we quote from her testimony:

Cross-examination by Mr. Hatch:

"When McLean first came to our house with the paper, I saw it, he gave it to me; I had it in my hands and read it over; it was a printed paper, and contained the word 'recommend' several times. That is the paper I signed. After I signed it, I gave it back to him. My husband signed it before I did. I explained to my husband what it was. That is the paper my husband signed. After I and my husband signed it, I gave up the contract to McLean; then he went away. After that he had a paper he asked me to sign at Belding. I had that paper in my hands and read it; it was a printed paper. Mr. Batey had already signed that when McLean handed it to me. I saw Batey's name on the paper. I had it in my hand and read it and signed that paper. After I signed it I handed it back to McLean. I read it over at that time. I read both papers over. They were both printed papers. I was willing to sign a recommend. I was perfectly willing to recommend Mr. McLean, as I understood he was a man of good character. I knew he intended to buy goods of the Saginaw Medicine Company. I was perfectly willing to recommend that he was a good man for them to sell goods to. I signed two papers in all, these two papers. That is all I signed.

"Q. I show you plaintiff's Exhibit 2. Look at that signature, is that yours?

"A. I sign my name Anna Batey.

"Q. Did you sign that?

"A. No, sir.

"*Q.* You didn't sign that?

"*A.* No, sir.

"*Q.* Do you swear that is not your signature?

"*A.* Yes, sir.

"*Q.* Do you know your husband's signature?

"*A.* Yes, sir.

"*Q.* Is that his signature?

"*A.* No, sir.

"*Q.* That is not his signature?

"*A.* No, sir.

"*Q.* Sure about that are you?

"*A.* I am. * * * I got a registered letter from the Saginaw Medicine Company soon after I signed that guaranty. Mr. Batey signed the registry receipt for that letter. * * * "

Re-direct examination by Mr. Shivel:

"*Q.* You stated on cross-examination that you didn't think that was your signature. I want you to take that contract again and look it over carefully and compare it with this letter which you say is your handwriting, and tell this jury whether that is your signature or not, whether you consider it to be your signature; look this letter over and look at your signature on here.

"*A.* My eyesight is rather poor— * * *

"*Q.* Compare that carefully, take your time, and tell the jury again; you say that is your letter?

"*A.* Yes, sir; that is my letter.

"*Q.* Now examine this signature on the contract?

"*A.* Well, yes that does look like my handwriting.

"*Q.* You understand this to be the second paper, don't you?

"*A.* Yes, sir. * * *

"*Q.* So that upon final—upon carefully looking at that signature you think it is your signature, do you?

"*A.* Yes, sir.

"*Q.* And you were mistaken?

"*A.* I do; I think I was mistaken."

There is no competent testimony in the case from which the inference can be fairly drawn that in procuring the guaranty Mr. McLean was acting for the plaintiff, or that he was authorized by the plaintiff to

make any statement which was .untrue. The testimony of Mr. McLean, and of the manager of the company taken in its entirety, is a clear denial of any such authority. The letter of instructions of March 19, 1910, sent to Mr. McLean, when read in its entirety is a complete answer to any such claim. It stated in language that cannot be misunderstood:

"The guarantee on this contract is a warranty of your good faith; no more, no less. It is a plain surety that we will receive, finally, the payment of the goods we advance to you."

Mr. McLean and the manager both say that the only instructions given Mr. McLean about procuring the guaranty were contained in this letter, and there is no testimony to the contrary.

It will be noticed in the testimony we quoted that Mrs. Batey testified that when she signed the paper she knew Mr. McLean was to obtain his goods of plaintiff, and "I was perfectly willing to recommend that he was a good man for them to sell goods to." We will refer to that subject later.

The plaintiff did not know Mr. McLean until their attention was called to him by Mr. Credit. The defendants had known him some time. We have referred to the fact that Mrs. Batey knew Mr. McLean was to obtain his goods of plaintiff, and that the paper was to be used to enable him to do so. The testimony of defendants discloses that they knew Mr. McLean was to sell goods that he was to procure from the plaintiff, and that before he could do so he must procure signers to the paper which he presented to them which was to be sent to the plaintiff. Knowing this fact, and knowing Mr. McLean, instead of making certain what the paper contained, they were willing to rely upon his statement as to what the paper contained, and signed it.

In this connection it may be well to quote from some authorities.

*Western New York Life Ins. Co.* v. *Clinton,* 66 N. Y. 326, was an action on a bond given by De Witt W. Clinton, conditional that Clinton, who had been or was about to be appointed agent for the plaintiff company, should faithfully account for all moneys collected, etc. It was claimed that the signatures of the sureties were procured by the misrepresentations of Clinton. The court said:

"Even if they [the sureties] were misled by the principal, at whose request the bond was executed, as to the character and extent of the obligation assumed, it is no valid defense to this action, unless it appears that the plaintiff was a party to the fraud practiced upon the defendants. * * * The position that the obligee in a bond is bound to seek out the sureties and explain to them the nature and extent of their obligation at the point of losing the security, or that he is to be held responsible for the fraudulent representations or concealment of the principal of any of the facts, is somewhat novel, and is not upheld by any adjudged case. It is the duty of the sureties to look out for themselves and ascertain the nature of the obligation embraced in the undertaking, and any other rule would not only work serious inconvenience, but render securities of this character of but little, if of any, value."

In *Casoni* v. *Jerome,* 58 N. Y. 315, which was an action on an administrator's bond, it was claimed by the sureties that they were deceived by misrepresentations made by the administrator when they signed the bond. The court said:

"The bond was given for the security of creditors [of whom plaintiff was one] and other persons interested in the estate, and the ignorance of the sureties, when they executed the bond, of the real nature of the administration, or that they may have been misled or deceived by those at whose solicitation they executed it, as to the nature or degree of the responsibility they assumed, cannot avail them as a defense

against the claims of persons for whose security it was taken, and who were in no way connected with the deception practiced upon them."

In *Powers* v. *Clarke*, 127 N. Y. 417, 423 (28 N. E. 402), which was an action on a guaranty to pay for goods sold by plaintiff to a customer, the trial court directed a verdict for plaintiff. This was reversed by the judges of the general term. They based their order of reversal upon the theory that the defendant had been deceived; that the plaintiff knew it, and hence had no right to rely upon a guaranty procured by misrepresentation. Mr. Justice Vann, delivering the opinion of the court of appeals, said:

"While the law requires the creditor to act in good faith toward the guarantor, it does not hold him responsible for any deception practiced by the principal upon the latter without the knowledge of the former, nor require him to make any disclosure or explanation, the withholding of which would not amount to a fraud."

In *Howe Machine Co.* v. *Farrington*, 82 N. Y. 121, 127, it is said:

"The evidence offered by the defendant [the surety in the bond] to show that Davis [the obligor], when he applied to him to sign the bond, represented that he was not in default to the plaintiff, was properly excluded. Davis, in procuring the defendant to execute the bond, was not acting as the plaintiff's agent, and the plaintiff is not responsible for any deception which Davis may have practiced upon the defendant to procure his signature, of which it was ignorant."

In *Phœnix Mut. Life Ins. Co.* v. *Holloway*, 51 Conn. 310 (50 Am. Rep. 21), the court approves of the rule laid down in *Western New York Life Ins. Co.* v. *Clinton*, 66 N. Y. 326, and says that in that case:

"It was held that it is no defense to an action against sureties on a bond given by an agent for the faithful performance of his duties, that the sureties

were ignorant as to the extent of the obligation assumed, or were misled by the principal in reference thereto, in the absence of proof that the obligee was a party to the fraud; it is not the duty of the obligee to seek out the sureties and explain to them the nature and extent of their obligation, but it is for the sureties to ascertain for themselves."

Even if McLean had been the agent of plaintiff to sell goods, that would not have made him its agent in furnishing the guaranty which would be a condition to his becoming agent, and would precede his appointment.

In *Davis Sewing Machine Co.* v. *Buckles,* 89 Ill. 237, it is said:

"A surety or guarantor cannot interpose the fraudulent or false representations of his principal as a defense to the payment of a note or bond, without connecting the payee with such representations."

In *Lucas* v. *Owens,* 113 Ind. 521 (16 N. E. 196), the defendant, surety on a promissory note, claimed in her defense that she was induced to sign the note as surety "by means of certain false and fraudulent misrepresentations, which are particularly set out, and which she alleges were relied on by her." The court said:

"A surety who has been misled by the principal as to the character and extent of an obligation, signed and assumed at the request of the latter, cannot make the fraud of the principal available as a defense, unless he can also show that the payee or obligee participated in, or had knowledge of, the fraud or deception."

In *Atlantic Trust & Deposit Co.* v. *Union Trust & Title Corp.,* 110 Va. 286 (67 S. E. 182, 135 Am. St. Rep. 937), the court said:

"It is well settled that a person proposing to become surety for the conduct or contracts of another has a right to be treated with perfect good faith. The law

does not as a rule, however, require that the party taking the security shall seek out the surety and explain to him the nature and extent of the obligation; nor does it hold him responsible for fraudulent misrepresentations made to the surety by the principal or by a third party, unless such misrepresentations are made with his knowledge or consent."

In *Magee* v. *Insurance Co.*, 92 U. S. 93, 100, it is said:

"It is, perhaps, to be inferred from the plea that the fact was—as the record, aside from the plea, shows it to have been—that the bond was executed at Mobile, and sent by Voorhees [the obligor] by mail to the company [the obligee] in New York. If this were so, the company, upon receiving it, was under no obligation to make any communication to the sureties. The validity of the bond could not depend upon their doing so. The company had a right to presume that the sureties knew all they desired to know, and were content to give the instrument without further information from any source. Under these circumstances, it was too late, after the breach occurred, to set up this defense."

See other cases cited in brief of appellant.

Before selling the goods the plaintiff wrote each of the defendants the letter, one of which we have before quoted. Defendants say they did not understand even then what they had agreed to do in the paper they signed, and did not understand the letter, and paid no attention to the letter. We have already shown that defendants knew the paper was procured to be forwarded to the plaintiff to enable Mr. McLean to get goods. This being so, we do not think defendants were excused from paying attention to the letters sent them by plaintiff, which characterized the paper which plaintiff had received, signed by them. See *Tobias* v. *Morris & Co.*, 126 Ala. 535, 551 (28 South. 517); Bigelow on Estoppel (5th Edition), 588; *Michigan Paneling Machine, etc., Co.* v. *Parsell*,

38 Mich. 475; *Harris* v. *Building & Loan Ass'n,* 122 Ala. 545, 554 (25 South. 200) ; 16 Cyc. p. 681.

Plaintiff, relying on its contract with Mr. McLean and the defendants, furnished the goods and extended to Mr. McLean credit.   We think it would be a travesty on justice if the defendants, under these circumstances, can be heard to say they are not liable.   The circuit judge should have directed a verdict in favor of the plaintiff for the full amount of its claim.

BROOKE, KUHN, STONE, BIRD, and STEERE, JJ., concurred.   MCALVAY, C. J., and OSTRANDER, J., concurred in the result.