## W. T. RAWLEIGH COMPANY v. C. A. BOYD and CHARLES HILL.

Western Section.   October 15, 1926.

Petition for Certiorari denied by Supreme Court April 9, 1927.

1. **Fraud. Evidence. Evidence held to show that signature of surety on a bond was not secured by fraud.**
   In an action to recover against the principal and surety on a bond given to secure the principal accounting for goods sold for the plaintiff where the evidence showed that the surety signed the bond without reading it, but without any misrepresentations on the part of the principal, held that it was not secured through fraud.

2. **Principal and surety. A surety is not entitled to be released from liability because his principal is more largely indebted than he supposed.**
   In an action to recover on a bond where the defense of the suit was that his principal was indebted to the plaintiff at the time the bond was executed, held that the fact that the principal was indebted at the time does not release the surety.

3. **Principal and surety. Fraud. Fraud of principal in securing a surety without participation of the creditor will not relieve the surety.**
   The fact that a principal misleads his surety in securing his signature to a bond will not relieve the surety as against the creditor unless the creditor participated in the fraud.

4. **Contracts. Complainant may sue any signer of a joint and several contract that he may elect.**
   Where a contract is joint and several, the party for whose benefit it is made may sue anyone or as many of the signers as he may elect and those sued can not complain. They in turn may sue the other signers of the contract for contribution.

Appeal from Chancery Court, of Lake County; Hon. V. H. Holmes, Chancellor.

Affirmed.

Morris & Morris of Obion, and Pierce & Fry of Union City, for appellants.

Burnett & Donaldson of Tiptonville, for appellee.

OWEN, J.   The defendants, C. A. Boyd and Charles Hill, have appealed from a decree rendered in the chancery court of Lake county, Tennessee, against them jointly in favor of the complainant, the W. T. Rawleigh Company.

The complainant's bill was based upon a contract executed by C. A. Boyd, designated as buyer, wherein the buyer agreed to purchase of complainant, who was designated as seller, at wholesale prices, such of complainant's manufactured products as the seller should determine to sell to the said buyer.

Complainant is a manufacturing concern, located at Freeport, Illinois. The buyer agreed to pay the invoice price for all products so purchased under the written agreement, also any balance due the seller at the date of the acceptance of this renewal contract by cash, or by installment payments satisfactory to the seller, subject to the discounts, as shown in current discount sheets.

It appears that the defendant, Boyd, was the representative, or a seller for the complainant throughout Lake county, Tennessee, and had represented the complainant in selling its products consisting of medicines, etc., for a number of years prior to the institution of this suit. Each year the complainant and the defendant, Boyd, would renew their contract. The contract sued on in the instant case was accepted by the complainant on January 4, 1922.

In addition to the said C. A. Boyd agreeing to sell certain goods for the complainant he also executed a guaranty contract. This guaranty contract was executed by W. N. Loggins, and the defendant, Charles Hill, both farmers of Lake county, Tennessee. Said guarantors agreed jointly and severally to guarantee unto the said W. T. Rawleigh Company, unconditionally, the payment in full of the balance due or owing said seller on account as shown by its books at the date of the acceptance of the contract of guaranty, by the seller, and the full and complete payment of all moneys due or owing, or that may be due or owing said seller and all indebtedness incurred by the buyer under the terms of this instrument. It was further agreed that the written acknowledgment by said buyer of the amount due or owing on his account, or any judgment rendered against him for moneys due the seller shall in every and all respects bind be conclusive jointly and severally against the said W. N. Loggins and Charles Hill.

Complainant filed its bill March 26, 1925, alleging that the said C. A. Boyd was indebted to complainant in the sum of $1641.78 with interest from January 1, 1923 for goods and merchandise sold and delivered to the said C. A. Boyd under the terms of the contract which was made an exhibit to complainants bill, and from which we have heretofore quoted. Charles Hill was sued as a guarantor or surety on said contract. It appears that Loggins had died and his estate was not sued.

The two defendants who have appealed, answered, denying all liability and Hill alleged that his signature to said contract or guaranty had been procured by the fraud of his co-defendant, C. A. Boyd.

The Chancellor found in favor of the complainant, as heretofore stated, sustained its bill, and gave judgment for the amount sued for. The defendants prayed and were granted an appeal, perfected the same, and have assigned sixteen errors.

A jury was called for in the instant case, but at the conclusion of all the testimony, the Chancellor instructed the jury that the only issue that he would submit to the jury was whether or not the complainant was entitled to interest on the account, the allowing of interest being in the discretion of the jury. The jury answered the issue in favor of the defendants as to interest and no interest was allowed.

By said assignments of error the defendants raised the following propositions:

(1) The court should have dismissed complainant's bill for the reason that contract had been altered or changed.

(2) Complainant was guilty of perpetrating a fraud upon the surety Hill in this: At the time Hill signed the guaranty bond sued on Boyd was indebted to complainant in the sum of $1600 or thereabouts.

(3) The court erred in excluding many letters, written by complainant to the defendant Boyd wherein complainant urged Boyd to sell the goods that it was shipping him, increase the sales, place the goods manufactured by complainant in the homes of the citizens of Lake county, which was Boyd's territory, it being insisted by these urgent letters to increase Boyd's sales. Boyd sold large amounts of goods shipped to him on a credit and was unable to collect from his customers.

It appears that Hill had been signing the renewal contract and guaranteeing the payment of Boyd's indebtedness for a number of years prior to the last one he signed.

Mr. Hill's explanation as to why he signed the contract sued on is as follows:

"Go ahead Mr. Hill and tell just how the contract was signed, if there was any conversation tell the whole thing, how it was executed? A. I was trying to get my corn out, Mr. Boyd come over there, I was very busy, my recollection is it was threatening rain, and this corn was on low land, Mr. Andy Anderson's place, and he come and said he had a contract, that he was selling medicine, and this contract was just for him to sell medicine, that I never would have to be bothered with it, that some one else would sign it, I just don't remember now, he talked on for some little bit, followed me around, I don't know whether Mr. Boyd pulled one row of corn or not, but it seems like he did, the distance of forty or fifty yards, and finally I told him to give me that thing, and I put my foot up on the wagon wheel and took a little book out of my pocket and put it on my knee and signed my name to it, and he told me it was for nothing only for him to peddle medicine around the country, he didn't say whether he owed anything and that it wouldn't bind me for anything, that is what Mr. Boyd told me.

"Q. At that time did you see anything about the contract, or read the contract or understand it? A. Not a bit under the sun, I just stated that I am risking your honor, I ain't got time to read it, and I just took it and signed.

"Q. Did you know to whom you were signing this contract? A. If he hadn't said so I wouldn't, I never took that much time to look at it.

"Q. Did you know at that time you were signing a contract for debts that Mr. Boyd owed to W. T. Rawleigh & Company? A. No, sir, if I had I never would have signed it.

"Q. Would you have signed it if you had been advised in the contract or otherwise that he owed any amount—$1641.87 or any other amount? A. No, sir, I sure would not, unless I was made to do it.

"Q. Did you ever hear, until this suit was brought that Mr. Boyd owed the W. T. Rawleigh Company any amount of money? A. I ain't just positive when it was, but I am pretty certain it was after, I don't know whether you call it sued or not, but Mr. Donaldson had the papers and asked me about it, but the first thing I heard about it he asked what I was going to do about it?

"Q. Was that after it was turned over to Mr. Donaldson for collection? A. Yes sir, I am pretty certain it was.

"Q. Was that before suit was brought in this case? A. I think so, yes sir.

"Q. Was that the first time you ever heard or knew anything about any indebtedness between Mr. Boyd and W. T. Rawleigh Co.? A. The first was this it wasn't but a little while Mr. Donaldson told me he had an account against me, but Mr. Gwaltney, just a few days before that, I don't remember exactly when, he told me that I had signed a paper binding me and I had better see him about it, I told him I guessed not.

"Q. How long had you known Mr. Boyd? A. Ever since he has been around this country.

"Q. How long is that, give an idea? A. Twelve or fifteen years.

"Q. Did you have faith and confidence in him and rely upon his integrity? A. If I hadn't I shore wouldn't have signed no paper for him.

"Q. Did W. T. Rawleigh, before this suit was brought, ever say anything to you write or inform you in any way that you had guaranteed the account of C. A. Boyd to them? A. I think not.

"Q. Or anything of that kind, or notify you that he owed them one dollar? A. I don't think they did.

"Q. Did you ever at any time know of the contract relative to their indebtedness between Mr. Boyd and the W. T. Rawleigh Com-

pany up to the time you signed this or any of the three contracts? A. No, I didn't know he owed them anything.

"Q. Was anything said to you at the time you signed the second contract or any of them? A. No indebtedness was ever mentioned to me that he owed them."

It will be seen from this evidence that Boyd did not prepetrate any fraud on Hill. Hill signed the paper that Boyd tendered him, made no investigation and had been signing for several years, each renewal contract, obligating himself to pay jointly or severally Boyd's indebtedness to complainant. The insistance that the contract was procured through fraud is overruled.

It is next insisted that the complainant should have sued W. N. Loggins' estate. The defendant Boyd testified that he would not say whether he told, or didn't tell, Hill that he owed complainant when the contract was signed. All of the evidence that was excluded by the Chancellor was properly excluded, because it was immaterial. Complainant was anxious for Boyd to sell its merchandise, to increase the sales, and the letters excluded were simply encouraging Boyd to sell boosting sales.

Boyd testified that he had outstanding and uncollected about $3500 in goods due on account for products sold to his customers, which he had purchased from complainant. So if he told Hill, at the time the last contract was signed Hill would not be out anything, that was an opinion of Boyd; he certainly expected to collect his account and pay the complainant.

There is no proof whatever that the complainant knew how Hill's signature was procured. There is testimony showing that Hill was notified, through complainant's secretary, as to Boyd's indebtedness.

A similar defense was made in the case of Hubbard v. Fravell, 12 Lea, page 309 as we have presented in the instant case. In that case the court said:

"The whole case is, in reality narrowed down to this, whether sureties can claim to be released from liability because their principal was more largely indebted than they supposed, they not having made any inquiry as to his indebtedness, either from his or the creditors. And if we concede, which the testimony does not justify, that the sureties did inquire of the principal, and he misled them, either by his positive statements or silence, as to the true state of his indebtedness, the law clearly is as the referee find, that the fraud of the principal, without the participation of the creditors, will not release the surety."

The case of Hubbard v. Fravell was cited and approved in Sewing Machine Co. v. Jackson et als., 15 Lea, 425-6, and the reason for upholding contracts of guaranty stated as follows:

"But, as was said in the New York case cited, to hold the surety discharged because of the omission of the creditor to advise him of the previous transactions between the debtor and creditor, in the absence of any inquiry on the subject, would establish a rule that would make instruments like the one in question of little value. In that case the debtor was largely in arrears with the creditor on sales of sewing machines, and the surety was seeking exoneration on the ground of concealment of the state of accounts between them when he became surety."

Complainant's contention are supported by the following authorities and in these cases similar defenses were made as in the instant case and all were decided in favor of complainant: W. T. Rawleigh Co. v. Leavors (Ala.), 95 So., 459; Hughes v. W. T. Rawleigh Co. (Ark.), 208 S. W., —; W. T. Rawleigh Co. v. Ellis (Ark.), 201 S. W., 110; W. T. Rawleigh Co. v. Rose (Ark.), 202 S. W., 850; W. T. Rawleigh Co. v. Pritchard, 236 S. W., 833; W. T. Rawleigh Co. v. Burney (Ga.), 96 S. E., 578; W. T. Rawleigh Co. v. Royal (Ga.), 119 S. E., 339; W. T. Rawleigh Co. v. Van Duyn (Idaho), 188 Pac., 946; W. T. Rawleigh Co. v. Osborne (Iowa), 158 S. W., 566; W. T. Rawleigh Co. v. Bane (Iowa), 165 N. W., 42; W. T. Rawleigh Co. v. Cook (Iowa), 205 N. W., 57; W. T. Rawleigh Co. v. Wilson's Ad. (Ky.), 283 S. W., 1057; W. T. Rawleigh Co. v. Trerice (Mich.), 195 N. W., 79; W. T. Rawleigh Co. v. Hoffman (Minn.), 202 N. W., 54; W. T. Rawleigh Co. v. Denham (Miss.), 81 S. W., 118; W. T. Rawleigh Co. v. Brown (Miss.), 108 So., 720; W. T. Rawleigh Co. v. Walker (Okla), 245 Pac., 417; Gordon v. Rawleigh Co. (Okla.), 245 Pac., 825; Sparkman v. Rawleigh Co. (Okla), 245 Pac., 828; Thomason v. Rawleigh Co. (Okla.), 245 Pac., 829; W. T. Rawleigh Co. v. Fletcher (Tex.), 275 S. W., 210; W. T. Rawleigh Co. v. Lemon (Tex.), 276 S. W., 1115; W. T. Rawleigh Co. v. Stroud (Wis.), 148 N. W., 876.

We quote from one of the cases cited, W. T. Rawleigh Co. v. Hoffman. The Supreme Court of Minnesota decided the case on February 26, 1925, reported in 202 N. W., page 54. In the Minnesota case, Stone, the judge, delivering the opinion, among other things said:

As a condition precedent to its acceptance of H's contract, plaintiff required him to procure two or more responsible guarantors. Accordingly he, and he alone, procured the execution by defendants of the comprehensive guaranty upon which their liability rests. Then, and not until then, both contract and guaranty were accepted by plaintiff. Hoffman was in realty a peddler of plaintiff's goods. The indebtedness sued for is the unpaid balance due plaintiff under the contract, Hoffman's performance of which was guaranteed by defendants. It is immaterial that a portion of the

stock purchased had formerly been in the hands of another representative of plaintiff; Hoffman having bought these goods under his contract and being bound accordingly for their payment.

(1) The defense is fraud; defendants insisting that their signatures to the guaranty was procured through the false and fraudulent representations of Hoffman. The evidence offered in support is fairly characterized by this excerpt from the testimony of defendant Johnson:

"He, (Hoffman) said he had sold his house and was going to work for the Rawleigh people, and asked me if I would sign a paper showing that he had a good reputation here where he lived, and was a man of good character. I told him I would and never looked at the paper which he produced to me any further."

Testimony of this kind was offered and received subject to objection, and later was stricken out because in no way binding upon plaintiff, hearsay, and irrelevant. Even though Hoffman was considered the agent of plaintiff, his act in procuring the required guarantors and their signatures was his own act and for his own benefit. It was not within the scope of his agency. He was not employed for that purpose. Rather, the procurement of the guaranty was a condition precedent to his employment or the continuance of it. A case precisely in point, one which in reason and authority was considered controlling, is Saginaw Medicine Co. v. Batey, 179 Mich., 651, 146 N. W., 329. See also Watkins Medical Co. v. Coombes, 66 Okla., 126, 166 P., 1072; Watkins Medical Co. v. Montgomery, 140 Ark., 487, 215 S. W., 638.

As to the insistance that Loggins' estate should have been sued, this is a joint and several contract and complainant could elect to sue complainant, Charles Hill, Hill may have a claim against Loggins' estate for its proportionate part of the liability.

It results that all the assignments of error are overruled and disallowed and the decree of the Chancellor is affirmed.

Complainant will recover of the defendants the amount of the judgment rendered in the lower court, with interest thereon, and all the cost of the cause, for which execution will issue.

It appears that defendants appealed by executing the oath for poor persons.

Heiskell and Senter, JJ., concur.