JAMES N. BROWN ET AL., APPELLANTS, V. CARY B. JAMES ET AL., APPELLEES.

FILED JANUARY 8, 1908. No. 14,952.

1. Note: PLEDGEE: EQUITIES. A note pledged before maturity as security for a loan made to the payee or owner is good in the hands of the transferee, who had no notice of equities between the original parties.

2. Pledge of Notes: DEBTS SECURED. Negotiable instruments may be pledged to secure liabilities arising in the future; but to ascertain what debts are secured resort must be had to the contract of the parties.

3. ———: ———. A contract of pledge, which provided that certain notes were to be held as security for a certain debt, and "any other liability or liabilities due or to become due or which may hereafter be contracted," *held*, under the circumstances of this case, not to secure the payment of moneys afterwards collected for the pledgee by the pledgor as agent and unlawfully converted by the latter.

APPEAL from the district court for Gage county: WIL-
LIAM H. KELLIGAR, JUDGE. *Affirmed as modified.*

*Samuel Rinaker, Robert S. Bibb* and *Horace Comfort,*
for appellants.

*A. D. McCandless* and *W. S. Glass,* contra.

EPPERSON, C.

James N. Brown and Frank L. Brown, partners doing
business as James N. Brown & Co., appeal from a decree
of the district court for Gage county awarding them fore-
closure of a mortgage in the sum of $2,174.93; the sole
complaint here being that the decree is inadequate in
amount to adjust the equities of the parties and should
have been for a much larger sum, to wit, $12,046.93.

It appears that on May 1, 1895, defendant James and
wife executed and delivered to defendant J. C. Burch a
mortgage upon the land in controversy to secure the pay-
ment of $7,000, evidenced by two promissory notes, due
May 1, 1896. About the 1st of September, 1895, the notes
were sent by the bank of Wymore to the plaintiffs herein.
Just what the purpose was is not made clear by the evi-
dence, nor do we consider it important. They were either
delivered to the plaintiffs for the purpose of sale, or as a
pledge to secure a loan which the defendant, the bank of
Wymore, contemplated securing from the plaintiffs later
on. At that time the bank was not indebted to plaintiffs,
Brown & Co., but the latter retained possession of the notes
and mortgage. Afterwards, in pursuance of an understand-
ing between plaintiffs and the bank, the notes and mort-
gage were held as collateral security from and subsequent
to December 31, 1895, for an indebtedness of $5,000 (evi-
denced by a promissory note) contracted on that date. In
addition to the $5,000 indebtedness, plaintiffs contend that
they are entitled to hold the security for other indebted-
ness due from the bank. The $5,000 note of December 31,
1895, is a stock collateral note containing provisions

whereby the bank pledged to plaintiffs certain notes to secure the said indebtedness and any other liability or liabilities of the bank to the plaintiffs, which provisions will hereinafter be specifically referred to.  On September 25, 1895, the mortgagor James and wife conveyed the land in controversy by warranty deed to Benjamin Burch in consideration of the payment of the mortgage indebtedness and certain other obligations due from James to the bank of Wymore.  Burch immediately conveyed the land to the bank, which held title until several years later, when the bank conveyed it to the defendants Taylor and Pisar.  The deeds, however, from James to Burch and from Burch to the bank were not recorded until August 26, 1896, on which date the bank failed.  Benjamin Burch and J. C. Burch were president and cashier, respectively of the defendant, the bank of Wymore, and it appears that in taking the mortgage and deed from James they were acting as the agents or trustees of the bank.

Some controversy exists as to when plaintiffs learned that the bank had procured title to the James land.  We are convinced that they learned of this fact when the bank failed, and not before, and that the officers of the bank purposely withheld knowledge of such fact from the plaintiffs until that time.  Soon after the failure of the bank J. C. Burch was appointed receiver and as such remained in possession of the bank's affairs for several months, during which time he issued to plaintiffs herein receiver's certificates Nos. 1 and 2, representing indebtedness due from the bank to plaintiffs aggregating $3,770.11.  Of this amount, $2,425.46 was money collected by the bank for plaintiffs upon mortgages belonging to the plaintiffs. $1,354.65 was owing to depositors at the time of the bank's failure and subsequently purchased by plaintiffs herein. Later, under the provisions of the banking law, the receiver was discharged and the bank took control of its own affairs and resumed banking business.  Some time prior to July 12, 1901, the bank collected for plaintiffs the sum of $636 on what is known as the Bauhman mort-

gage. We are left entirely in the dark as to the time when this collection was made. In July, 1901, J. C. Burch, cashier of the bank, went to New York city for the purpose of negotiating a settlement with plaintiffs, who were then threatening to institute actions to foreclose the mortgages which the bank had collected and failed to account for. While there he executed a contract in the name of the bank purporting to convey to plaintiffs the James notes and mortgage and certain land, and to give authority to plaintiffs to sell the same, and pledged the proceeds thereof to the payment of the receiver's certificates and the Bauhman collection above described. Other items of indebtedness also were included in this contract, but plaintiffs no longer contend that they should be included in their decree of foreclosure.

Plaintiffs now ask to foreclose the James mortgage for the purpose of satisfying the items of indebtedness above described, together with a remainder due upon the $5,000 note given by the bank on December 31, 1895. The district court found that there was due upon the $5,000 note the sum of $2,015.38, with interest at 5 per cent. per annum from the institution of the suit, together with the sum of $159.10 for taxes paid by plaintiffs upon the mortgaged property, and found against plaintiffs as to the other items of indebtedness relied upon. The stock collateral note is in part as follows: "$5,000. New York, December 31, 1895. On demand, without grace, for value received, we promise to pay to James N. Brown & Co. or order, five thousand dollars, at their office in New York city, in United States gold coin or its equivalent, with interest at the rate of — per cent. per annum from date hereof, having with said bank as collateral security for payment of this or any other liability or liabilities of ours to said firm due or to become due, or which may be hereafter contracted, the following property, viz., collateral to the amount of $13,913.86, as listed upon attached memorandum, marked J. C. B., Cashier." The James $7,000 notes were included in the memorandum referred to in the

above stock collateral note. By reason of the provision pledging the security "for payment * * * of any other liability or liabilities of ours to said firm due or to become due, or which may be hereafter contracted," plaintiffs contend that the James notes are chargeable as security for the several items represented in the receiver's certificates and the Bauhman collection.

It is argued that the sums subsequently converted by the bank to its own use constituted indebtedness arising by virtue of an implied contract which the law imposes in such cases upon the tort-feasor to repay to the owner the value of the property converted. There can be no doubt that such liability exists, and that the law implies a contract in such cases, but it cannot be said that at the time of the making of the contract in the stock collateral note the parties contemplated the illegal converting of the money and funds due plaintiffs, nor that they intended that the security pledged should be used for such purposes. The agreement of the parties must determine what debt or debts are secured, and such agreement must be ascertained from the writing by which the securities were pledged. A fair interpretation of the agreement made in this case demands that it be construed to secure such indebtedness only as might be contracted by the parties in the legitimate transaction of business. If the contract, standing alone, was not susceptible of such construction, we think it is rendered so when read in connection with an instrument executed by the bank July 14, 1896, and accepted by the plaintiffs. This is an additional or substituted pledge of several notes, including the James notes, and provides: "The following is a list of collateral notes held by James N. Brown & Co. for note dated Dec. 31, 1895, originally made for $5,000, and of which there is now due $3,440, and one demand note for $3,000, dated July 14, 1896. It is expressly understood and agreed that any part or all these collateral notes shall be applicable as security in the discretion of James N. Brown & Co. on either or both notes." These agreements should be con-

sidered together in determining what indebtedness the collateral notes secured. And it is apparent that after July 14, 1896, the collateral described in the instrument of that date was not intended by the agreement of the parties as security for any indebtedness other than the two notes described. The $3,000 note therein mentioned was subsequently paid and has nothing to do with the present controversy.

For the same reasons plaintiffs cannot in this action enforce collection of receiver's certificates Nos. 3 and 199, which represent the debts plaintiffs bought of the bank's depositors. Intimate business relations had existed between plaintiffs and the bank since 1890. James N. Brown at one time purchased one-half the capital stock of the bank for himself and friends, which, however, was disposed of before the bank's failure. Frank L. Brown owned 20 shares of the capital stock of the bank when it failed. Each of the plaintiffs, at different times, held positions —director and vice-president—in the bank of Wymore. We are convinced that plaintiffs, or one of them at least, purchased the depositors' claims against the bank as a speculation, probably believing at the time that the bank would pay out in full; and, having bought these claims, they cannot expand their previous contract for collateral so as to cover such indebtedness. Neither is the Bauhman collection secured by the pledge. The evidence does not disclose when this liability was incurred, but the reasons above given for rejecting the other obligations apply to this. The contract of July 12, 1901, gave no rights to plaintiffs as against the equities of Taylor and Pisar, who had previously paid full value for the land, for the reason that it was executed after the vesting of their interests, and the plaintiffs do not now rely upon this subsequent contract as against Taylor and Pisar.

Computing the amount of recovery upon the $5,000 note, the court found that there was due thereon September 22, 1896, $3,568.37, upon which $1,900.49 had been paid, leaving a remainder of $1,667.88 due January 1, 1900. The

evidence does not show the accuracy of the court's computation. Instead, we find that there was due, August 26, 1896, $3,644.37, which had, on January 1, 1900, been reduced to $1,743.88. The trial court allowed interest at 5 per cent. upon the amount it found due, and then only from the commencement of this action. Evidently the court considered the rate of interest allowed by the laws of New York in such cases to be 5 per cent. We find no evidence to support this conclusion. Instead, the evidence is that the debt drew interest at 6 per cent. (the legal rate in New York according to the testimony of one of the plaintiffs), which we think should be considered as the contract rate. Plaintiffs are also entitled to interest from January 1, 1900. It follows that the amount due on the date of the decree was $2,576.22 instead of $2,174.93.

Plaintiffs argue that defendant's evidence as to the payment of the $1,900.49 was incompetent, because the witness J. C. Burch, who was the only witness called by defendants to prove this fact, testified from a memorandum which was copied from the bank's books. This testimony was given by deposition, and we are unable to find where the objection made to this evidence was ruled on by the trial court, or an exception entered to its admission. Correspondence between the bank's officers and plaintiffs shows that funds were available for the bank's creditors, and, further, that some of the bank's books were lost. In view of these facts, we give weight to the evidence of payments, rather than the testimony of one of plaintiffs' witnesses, who stated that nothing had been paid on this note. The James notes were specifically pledged for the security of this debt. There was no intention of merger when the bank acquired fee title from James. When the defendants Taylor and Pisar purchased the land, the public records disclosed the existence of the James mortgage, and an assignment thereof to the plaintiffs, who had possession of the notes. Defendant Taylor, at least, had actual knowledge that the mortgage was not

fully paid. Plaintiffs are *bona fide* holders of the James notes to the extent of their interest herein determined.

Defendants contend that the evidence does not justify a recovery by plaintiffs in any amount, and in their brief ask the court to dismiss the plaintiff's action. The record shows that the defendants did not appeal, and, moreover, paid the amount found against them to the clerk of the district court, and for this reason are in no position to now question the judgment of the trial court.

The evidence clearly indicates that plaintiffs are entitled to recover the amount due on the $5,000 note, and we recommend that the decree be modified so as to fix the amount of recovery at $2,576.22, and that the decree, as modified, be affirmed.

DUFFIE and GOOD, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is modified so that plaintiffs shall recover $2,576.22, and, as so modified, is affirmed.

JUDGMENT ACCORDINGLY.