[Civ. No. 3312. Second Appellate District, Division Two.—June 7, 1921.]

## H. H. GRISWOLD, Appellant, v. S. T. MORRISON et al., Respondents.

[1] FRAUD—SALE OF HOGS—SUFFICIENCY OF PLEADING.—In an action on a promissory note given in payment of certain hogs, an affirmative defense to the effect that the hogs were not sound but were suffering from cholera and that plaintiff knew the condition of the hogs at the time of the sale, but that defendants did not, is fatally defective where there is no allegation that plaintiff made any false representation fraudulently or that he concealed the condition of the hogs with intent to deceive.

[2] ID.—PARTIAL FAILURE OF CONSIDERATION—PRO TANTO DEFENSE— PLEADING.—Where, as the result of fraud, there is a partial failure of consideration, and the amount of damage is definite and can be ascertained by calculation, the fraud may be pleaded in reduc-

tion of damages as a defense *pro tanto;* but, to avail himself of such defense, the defendant must show affirmatively a right of action in his favor arising out of the fraud.

[3] ID.—NATURE OF STATEMENT—FRAUDULENT REPRESENTATION—WARRANTY.—A fraudulent representation is an antecedent statement made as an inducement to the contract, but is not a part or element of the contract; on the other hand, to constitute an express warranty the statement must be a part of the contract.

[4] ID.—WARRANTY OF CONDITION OF HOGS—INSUFFICIENT PLEADING. In an action on a promissory note given in payment of certain hogs, an allegation in the answer that, at the time of sale, plaintiff "represented to the defendants that said hogs so purchased were in good health and sound physical condition and free from cholera or other infectious or contagious diseases and were merchantable hogs," is not sufficient to show a breach of an express warranty, there being no allegation that plaintiff "warranted" the soundness of the hogs, nor any equivalent averment, as, for example, an averment that the buyer understood that the alleged representation was to be a part of the contract of sale.

[5] ID.—JOINT TORT-FEASORS—COUNTERCLAIM.—In an action on a promissory note given in payment of certain hogs, the defendant may interpose a counterclaim based upon alleged false and fraudulent representations, made by plaintiff and another person, that the hogs were sound and free from disease, notwithstanding that other person is not a party plaintiff to the action.

[6] ID.—PROOF OF SCIENTER—ERRONEOUS INSTRUCTION.—In an action on a promissory note given in payment of certain hogs, an instruction charging the jury that if they believe from a fair preponderance of the evidence that the payee of the note represented to defendants that the hogs were sound and free from disease, that defendants believed such representation and relied thereon, and that. the hogs, when sold, were not sound, then they should find that the payee of the note had been guilty of fraud and deception and had received the note from defendants under misrepresentation, is erroneous, in that it does not require the jury to find that the payee of the note had knowledge of its falsity, or what in law is equivalent to proof of the *scienter.*

[7] PROMISSORY NOTE—INDORSEMENT AS SECURITY FOR PRE-EXISTING DEBT—STATUS OF INDORSEE.—An indorsee of a note merely as collateral security for a pre-existing debt owing to him by his indorser is a holder for value and in the usual course of business, and the note, in the hands of such indorsee, if, at the date of indorsement, it is taken without notice of any infirmity in the instrument, is not subject to existing equities between the original parties.

[8] ID.—INDORSEMENT AS INDEMNITY—TRANSFER FOR VALUE AND IN DUE COURSE.—The indorsee of a note, indorsed to indemnify him

against future loss on account of an existing liability to a third person, is a transferee for value and in due course, the same as if the note had been indorsed to secure a pre-existing indebtedness due to him from his indorser.

[9] ID.—INDORSEMENT AS INDEMNITY AGAINST POSSIBLE FUTURE LOSS —LIEN OF INDORSEE.—A person to whom a promissory note has been indorsed as collateral to indemnify him against possible future loss arising out of an existing liability incurred for and on behalf of his indorser has a lien on the note to the extent of any loss that he may sustain by reason of such liability.

[10] ID.—NOTICE OF INFIRMITY BEFORE PAYMENT IN FULL—WHEN CODE PROVISION APPLICABLE.—The provision of section 3135 of the Civil Code that "where the transferee receives notice of any infirmity in the instrument . . . before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him," is applicable only where the obligation incurred by the holder of the note is such that, on discovering the infirmity in the instrument, he is relieved from all further legal obligation to make any further payment, as, for example, where the note has been transferred to him in consideration of his promise to make future payments to his transferor.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

Ault & Anderson for Appellant.

Kenton A. Miller and Utley & Smith for Respondents.

FINLAYSON, P. J.—This is an action on a promissory note for $1,000, dated May 29, 1919, and executed by defendants to one Akers as payment for certain hogs bought by defendants from Akers. The latter, before the maturity of the note, indorsed and delivered it to plaintiff, who, claiming to be an innocent indorsee in due course of business, for value and without notice of any infirmity in the instrument, sues defendants as the makers. The case was tried before a jury, the verdict was in favor of defendants, and from a judgment that he take nothing by the action plaintiff appeals.

In their answer, defendants set up two affirmative defenses and four counterclaims. In their first affirmative

defense (designated in the answer as the second defense, the first defense consisting of denials), defendants allege, in substance and effect, that plaintiff and Akers owned the hogs, or plaintiff had some interest therein; that defendants purchased the hogs for the purpose of fattening them for the market, which fact was communicated to plaintiff and Akers; that the hogs were not sound but were suffering from cholera; that plaintiff and Akers knew the condition of the hogs at the time of the sale but defendants did not; and that, by reason of the diseased condition of the hogs, their sale to defendants was illegal and contrary to public policy. There is no allegation that plaintiff or Akers misrepresented the condition of the hogs or that either withheld from defendants knowledge of their condition for the purpose or with the intent to deceive or defraud. In short, nowhere in defendants' first affirmative defense is there any allegation of *scienter* or of fraudulent intent.

The second affirmative defense (designated in the answer as the third defense), after repeating the allegations of the first affirmative defense, alleges that plaintiff and Akers represented to defendants that the hogs were sound and free from disease; that, shortly after their purchase by defendants, some of the hogs, the aggregate value whereof was $764, died from cholera; and that by reason thereof there has been a failure of consideration for the note to the amount of $764.

In their counterclaims defendants allege that they purchased the hogs from plaintiff and Akers; that plaintiff and Akers falsely represented that the hogs were sound and free from all contagious or infectious diseases; that defendants relied upon such representations; that such representations, when made, were known by plaintiff and Akers to be false, and were made with the intent to defraud defendants; that upon discovering the falsity of the representations and that the hogs were suffering from cholera, defendants tendered them back to plaintiff and Akers and demanded a rescission of the contract of sale and the return of the promissory note, which, it is alleged, plaintiff and Akers refused to do; that, by reason of the cholera with which the hogs were affected, defendants were damaged in various sums, namely, $60 for veterinary

services and medicines furnished the hogs, $150 for wages paid a man to care for the hogs while they were suffering from cholera, $1,000 damages to defendants' ranch by reason of the presence of the diseased hogs thereon and the dissemination of the cholera germs, and $1,000 damages resulting from loss of profits that would have been made had the hogs been sound and had they been sold by defendants after they had been fattened for the market.

To each affirmative defense and counterclaim plaintiff interposed a general demurrer, which he claims should have been sustained.

[1] The first affirmative defense is fatally defective in that it fails to allege that either plaintiff or Akers made any false representation fraudulently, or that either of them concealed the condition of the hogs with intent to deceive. [2] Where, as the result of fraud, there is a partial failure of consideration, and the amount of damages is definite and can be ascertained by calculation, the fraud may be pleaded in reduction of damages as a defense *pro tanto* (*Russ etc. Co.* v. *Muscupiabe etc. Co.*, 120 Cal. 529, [65 Am. St. Rep. 186, 52 Pac. 995]; *Harrington* v. *Stratton*, 22 Pick. (Mass.) 510; *Burnett* v. *Smith*, 4 Gray (Mass.), 50); but, to avail himself of such defense, the defendant must show affirmatively a right of action in his favor arising out of the fraud (*Reese* v. *Gordon*, 19 Cal. 147). It has been held that if, with the intent to deceive his vendee, the vendor of such food animals as hogs or cattle, knowing that they are diseased and that the vendee intends them for the market, nevertheless sells them at a sound price and the vendee is ignorant of their true condition, the vendor is guilty of a fraudulent concealment and the rule of *caveat emptor* does not apply. (*Grigsby* v. *Stapleton*, 94 Mo. 423, [7 S. W. 421]; *Puls* v. *Hornbeck*, 24 Okl. 288, [138 Am. St. Rep. 883, 29 L. R. A. (N. S.) 202, 103 Pac. 665].) But in such cases it is necessary to allege that the concealment was with intent to deceive. (*Hanson* v. *Edgerly*, 29 N. H. 343; *Clark* v. *Bamer*, 2 Lans. (N. Y.) 67; *Jordan & Sons* v. *Pickett*, 78 Ala. 331.) Fraud has its foundation in intention, and that intention is a fact which ought to be alleged. It is one of the facts constituting the fraud. (*Woodroof* v. *Howes*, 88 Cal. 190, [26 Pac. 111]; *Feeney* v. *Howard*, 79 Cal. 528,

[12 Am. St. Rep. 162, 4 L. R. A. 826, 21 Pac. 984]; *Sheldon* v. *Davidson,* 85 Wis. 138, [55 N. W. 161]; *Spead* v. *Tomlinson,* 73 N. H. 46, [68 L. R. A. 433, 59 Atl. 376]; *Zabriskie* v. *Smith,* 13 N. Y. 322, [64 Am. Dec. 551].) Though it has been said that the intent to deceive must be charged in positive terms and not left to inference (*Bartholomew* v. *Bentley,* 15 Ohio, 659, [45 Am. Dec. 596]; *McKibbin* v. *Ellingson,* 58 Minn. 205, [49 Am. St. Rep. 499, 59 N. W. 1003]), we think that if the terms employed by the pleader, taken in their ordinary signification, necessarily include the idea of fraudulent intent, that is enough. Thus, for example, it is a sufficient allegation of fraudulent intent to aver that the false representation or the concealment was *fraudulently made.* (*Sallies* v. *Johnson,* 85 Conn. 77, [Ann. Cas. 1913A, 386, 81 Atl. 974].) Unfortunately for respondents, they are not in a position to avail themselves of this liberal rule, for nowhere in their first affirmative defense is any fact alleged from which an intent to deceive may be inferred. It is not even alleged that plaintiff or Akers knew, or had reason to believe, that defendants were ignorant of the diseased condition of the hogs. True, it is alleged that defendants did not know and that plaintiff and Akers did know that the hogs were sick and diseased; but there is no allegation that plaintiff or Akers was aware of defendants' ignorance respecting the true condition of the hogs. There is, therefore, a failure to allege facts showing a fraudulent intent, and for that reason the demurrer to the first affirmative defense should have been sustained.

Respondents, as their sole reply to appellant's objection to the sufficiency of the first affirmative defense, contend that the defense is based, not on fraud, but on the illegality of the contract. There is no merit in this contention. Because the Penal Code makes it a crime to suffer infected animals "to be driven on the public highway" (Pen. Code, sec. 402d), respondents argue that the contract of sale was contrary to public policy and void. But there is no allegation that the contract of sale contemplated that the hogs should be "driven" on the public highway. For aught that appears from the allegations of the first affirmative defense, it is quite possible that the hogs were to be conveyed to respondents' ranch without being "driven"

thereto, or without being driven thereto on any "public highway."

What we have said of the first affirmative defense applies with equal force to the second, unless, as respondents claim, the second affirmative defense shows the breach of an express warranty. The sole basis for the claim that there was an express warranty is the allegation that, at the time of the sale, plaintiff and Akers "represented to the defendants that said hogs so purchased were in good health and sound physical condition and free from cholera or other infectious or contagious diseases and were merchantable hogs." There is a definite distinction between a fraudulent representation and a warranty. [3] A fraudulent representation is an antecedent statement made as an inducement to the contract, but is not a part or element of the contract. On the other hand, to constitute an express warranty the statement must be a part of the contract. (35 Cyc. 368, 372.) Although, to constitute an express warranty, no particular form of words is essential, and it is not necessary that the word "warranty" should be used, it must at least appear that the buyer understood that the seller's affirmation was a warranty, that is, that it was intended to be a part of the contract. (24 R. C. L., p. 167; 35 Cyc. 374.) [4] Here there is no allegation that plaintiff or Akers "warranted" the soundness of the hogs, nor is there any equivalent averment, as, for example, an averment that the buyer understood that the alleged representation was to be a part of the contract of sale. For these reasons we think that the demurrer to the second affirmative defense should have been sustained.

[5] Each counterclaim alleges that plaintiff and Akers falsely and fraudulently represented that the hogs were sound and free from disease. Akers is not a party to the action. A counterclaim must be one in favor of a defendant against a plaintiff "between whom a several judgment might be had in the action." (Code Civ. Proc., sec. 438.) Appellant claims that if, as alleged by respondents in their counterclaims, he and Akers together fraudulently misrepresented the condition of the hogs, there could be no several judgment against him in favor of respondents, but only a joint judgment against himself and Akers, and that, therefore, any damages which defendants

may have suffered by reason of the alleged fraud cannot be set off as a counterclaim in this action. This, as we understand it, is the sole objection urged here by appellant against the sufficiency of the counterclaims. There is no merit in that objection. The counterclaims are based on tort, i. e., the fraud alleged to have been perpetrated by appellant and Akers upon respondents. If, as the counterclaims allege, plaintiff and Akers were guilty of fraud, they were joint tort-feasors. But a plaintiff may sue one or all of joint tort-feasors (30 Cyc. 122) ; and if he elects to sue but one, he is entitled to a judgment against that one. (*Chetwood* v. *California Nat. Bank,* 113 Cal. 426, [45 Pac. 704] ; *Dawson* v. *Schloss,* 93 Cal. 194, [29 Pac. 31].) This, therefore, is a case where, if the allegations of the counterclaims be true, defendants are entitled to a several judgment against plaintiff. (See *Walker* v. *Johnson,* 28 Minn. 147, [9 N. W. 632].)

Appellant complains of certain instructions given by the court. From so much of the testimony as is set forth in the briefs, we infer that there was no evidence that appellant was a part owner of the hogs or that he had any interest therein or any direct connection with their sale. The theory that respondents adopted at the trial seems to have been substantially this, that appellant was not an indorsee of the note for value and in due course of business, and that, therefore, he held the note subject to respondents' defense of fraud in the sale of the hogs.

[6] By instruction No. 11 the court, in substance, charged the jury that if they believed from a fair preponderance of the evidence that Akers represented to defendants that the hogs were sound and free from disease, that defendants believed such representation and relied thereon, and that the hogs, when sold, were not sound, then that they should find that Akers had been guilty of fraud and deception and had received the note from defendants under misrepresentation. This instruction is assailed on the ground that it permits a finding of fraud in favor of defendants without requiring the jury to find a *scienter.* The criticism is that the instruction should have required the jury to find, not only that the representation was false, but that Akers had knowledge of its falsity, or what in law is equivalent to proof of the *scienter.* The criticism

is just. We are aware of no authority which will sanction a defense grounded on deceit unless the false representation has been made with knowledge of its falsity, or what in law is equivalent thereto, and with intent to deceive. A misrepresentation knowingly made is sufficient to warrant an inference of fraudulent intent; but to hold that the knowledge or the intent of the person making the misrepresentation is immaterial would be against principle and authority. (*Trimble* v. *Reid,* 97 Ky. 713, [31 S. W. 861]; *Stone* v. *Denny,* 4 Met. (Mass.) 151; *Cowley* v. *Dobbins,* 136 Mass. 401.)

Respondents remind us that the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true, is, in law, the equivalent of actual knowledge of the falsity. (Civ. Code, sec. 1572, subd. 2.) But the vice of the instruction is that it did not require the jury to find either that Akers had actual knowledge of the falsity of the alleged misrepresentation or the legal equivalent of such actual knowledge. While it is true that there are cases where the author of a false assertion may be guilty of actionable deceit though he believes his representation to be true, yet the facts upon which this constructive knowledge is made to depend should be found by the jury under appropriate instructions. The instruction here complained of entirely ignores the element of *scienter.* Moreover, the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true, does not constitute actual fraud unless it be made with intent to deceive the other party to the contract or to induce him to enter into it. (Civ. Code, sec. 1572.) The instruction entirely ignores the necessity of such intent. The giving of the instruction was prejudicial error, necessitating a reversal of the judgment and a new trial.

By instruction No. 12 the jury was told, in substance and effect, that if plaintiff purchased the note before maturity, for a valuable consideration and in good faith, without knowledge of the alleged infirmity in the instrument, and honestly advanced money upon the faith of the note, then he "would be entitled to recover only such sum or sums as he honestly advanced upon the face of said

note in good faith before he was notified or informed by the defendants that said hogs were suffering from cholera or other infectious or contagious diseases.'' Appellant claims that this instruction is misleading in that it assumes that, instead of purchasing the note outright, he made advancements thereon from time to time. Respondents, on the other hand, assert that appellant parted with nothing before he received notification of their rescission of the contract, and that, therefore, he stands in no better position than his indorser, Akers.

To understand the criticism aimed at this instruction, it is necessary to make a further statement of the facts. It seems that prior to and at the date of the sale of the hogs Akers was indebted to two banks in sums that aggregated $762. To each of these banks Akers had executed his promissory note for the amount of his indebtedness. Appellant, in some manner not disclosed by the record, but probably as an accommodation indorser, was liable for the payment of these notes. The record does not show when Akers' notes to the banks matured. We have no means of knowing whether either of them had matured prior to the transfer by Akers to appellant of the note that is in suit here. On the very day that respondents executed to Akers, as payee, their note for $1,000 in payment for the hogs, Akers indorsed and delivered it to appellant. At the same time appellant gave Akers $50, who, at the time, was further indebted to appellant in the sum of $36.20, the balance due appellant on a note previously executed to him by Akers. Some months after the transfer to appellant of the note in suit here—the note for $1,000 that respondents had given to Akers in payment for the hogs —appellant paid to the banks the amounts due upon the two notes upon which he was liable as a guarantor or surety for Akers. At the time when Akers indorsed and transferred to appellant the note in litigation here, they agreed that after appellant should succeed in collecting from respondents the principal and interest of the note, and after he had reimbursed himself for any sums that he might have to pay to the two banks on account of Akers' notes to those institutions, and after he had satisfied, from his collection on respondents' note, the other amounts owing him by Akers, namely, the sums of $50 and $36.20, re-

spectively, the balance of his collection on the thousand dollar note should be paid to Akers. From these facts it is apparent that the note in suit here was transferred by Akers to appellant as collateral security: (1) to secure an indebtedness of $86.20 then due to appellant from Akers, made up of the $50 that he then was loaning Akers—under the facts stated the $50 was received by Akers as a loan—and the $36.20 that was due to appellant as the balance of a note previously given him by Akers; and (2) to secure or indemnify appellant against any loss that he might sustain by reason of his liability on the two notes that Akers had executed to the banks—obligations for which, as between themselves, Akers was liable as the primary debtor and appellant as a guarantor or surety only. The day after Akers indorsed the note to appellant the latter was informed by respondents that they had rescinded the contract of sale on account of the alleged false representation, or fraudulent concealment, respecting the condition of the hogs.

If appellant was without notice of the alleged fraud at the time when respondents' note was indorsed to him by Akers, then without doubt instruction No. 12 is not only erroneous but prejudicial. For, in that event, appellant, regardless of any notice that he subsequently may have received respecting Akers' fraud in the sale of the hogs, would be entitled to recover from respondents the sum of $86.20 at least, i. e., the said sum of $50 that he loaned to Akers at the time when the note was indorsed to him and Akers' pre-existing indebtedness of $36.20, the balance due on the note previously executed by Akers to appellant. A more difficult problem is presented by the question whether, as to the $762 for which appellant was liable to the banks as an accommodation indorser for Akers, the former took the note in litigation as a holder for value and in due course of business.

[7] While there has been much conflict in the decisions, it is the established law in the federal courts and in most states, including our own, that an indorsee of a note merely as collateral security for a pre-existing debt owing to him by his indorser is a holder for value and in the usual course of business, and the note in the hands of such indorsee, if, at the date of the indorsement, it is taken

without notice of any infirmity in the instrument, is not subject to existing equities between the original parties. This is the majority rule and is usually referred to as the federal rule; while the contrary rule, which, until the adoption of the uniform negotiable instrument law, prevailed in New York and about a dozen other states, is frequently referred to as the New York rule. (8 Corpus Juris, 488.) The federal rule is, as we have said, the one that obtains in this state. (*Sackett* v. *Johnson*, 54 Cal. 107; Negotiable Instrument Law, Civ. Code, secs. 3105–3110; note to *German American Bk.* v. *Wright*, Ann. Cas. 1917D, 387.)

[8] The difficult question with which we are confronted is this: Under the so-called federal rule, is the indorsee of a note, indorsed, not to secure a pre-existing indebtedness due to him from his indorser, but to indemnify him against future loss on account of an existing liability to a third person, a transferee for value and in due course?

Though he was liable to each bank for the amount that it had loaned Akers, still, until appellant paid the amounts due the banks, Akers, who was primarily liable therefor, did not become appellant's debtor. As to the amounts that appellant was obliged to pay to the banks to satisfy these obligations for which Akers was primarily liable, the note in suit here was not indorsed to appellant by Akers to secure an existing indebtedness then owing to him by Akers. Rather, as to those amounts, the note was indorsed to appellant as indemnity to indemnify or secure him harmless against future possible loss, namely, loss in the event that he should thereafter become obliged to pay the amounts that Akers had borrowed from the banks. Under these circumstances, is appellant protected by the so-called federal rule? We have found no case directly in point. Of the cases to which our attention has been called, those most nearly in point are two Alabama cases—*Bank of Mobile* v. *Hall*, 6 Ala. 639, [41 Am. Dec. 72], and *Andrews* v. *McCoy*, 8 Ala. 920, [42 Am. Dec. 669]. Those cases would be in point but for the fact that the New York, and not the federal rule, obtains in Alabama. In these two Alabama cases the supreme court of that state held that a negotiable instrument received as indemnity against a possible future loss, even though that loss afterward actually occur, is not

taken in the usual course of trade, and, therefore, the note remains subject to existing equities between the original parties. But, as we have said, Alabama is one of those states where the so-called New York rule obtains, or, at any rate, did obtain at the date of those decisions. So that these Alabama cases may not be persuasive precedents in states where, as with us, the federal rule prevails.

So far as the question before us is concerned, we are unable to see any distinction between an antecedent debt in the form of an absolute obligation due to the transferee from his transferor and an existing but previously created liability upon which the transferee may suffer a future loss or damage, even though that loss may be contingent upon the failure of the transferor to pay the debt for which his transferee, for his accommodation, became liable as a guarantor or surety. It seems to 'us to be sufficient if the transferor of the collateral note is in such contract relation with his transferee as renders it advantageous to the latter to have additional security for the performance by his transferor of the antecedent obligation. This conclusion finds support in the reasoning pursued in the following cases: *First Nat. Bank* v. *Busch*, 102 Minn. 365, [113 N. W. 898]; *Brown* v. *James*, 80 Neb. 475, [114 N. W. 591]; *State Bank* v. *Holland*, 60 Tex. Civ. App. 515, [128 S. W. 435]; *Forstall* v. *Fussell*, 50 La. Ann. 249, [23 South. 273]; *Lee* v. *Whitney*, 149 Mass. 447, [21 N. E. 948].

We can see no force in the argument advanced by the Alabama court to the effect that because the transferee of the note given as collateral security may never have to pay anything on account of the pre-existing liability assumed by him for the benefit of his transferor, he, therefore, should not be regarded as a holder in due course. In every case where collateral is put up to secure the performance of an obligation, as, for instance, the payment of a debt immediately owing to the transferee by his transferor, it is possible that the security may never have to be enforced. It is always possible that the debtor may pay his debt without making resort to the security necessary. And yet no court, in a jurisdiction where the federal rule obtains, would for a moment hold that the indorsee of a note transferred to secure an antecedent debt due to him from

his indorser was not a transferee for value and in due course merely because the indorser might voluntarily pay the debt that he owes his indorsee without compelling the latter to have recourse to the note given as security.

The Alabama cases, it will be noticed, proceed upon the theory, not that value was not given for the note, but that the transaction is not a dealing in the usual course of trade. Such a holding is not warranted by the negotiable instrument law of this state. That law defines a holder in due course as one "who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." (Civ. Code, sec. 3133; Stats. 1917, p. 1540.) If appellant had no notice of the infirmity in the note at the time when it was indorsed to him, then he took it under all the conditions prescribed in this code section as those necessary to constitute one a "holder in due course," unless it can be said that he did not take it for "value." Under the reasoning pursued by the courts in *First Nat. Bank* v. *Busch, supra, Brown* v. *James, supra, State* v. *Holland, supra, Forstall* v. *Fussell, supra,* and *Lee* v. *Whitney, supra,* appellant did take the note for value even though, with respect to his liability on Akers' notes to the banks, his danger of loss thereon was not absolute but contingent.

Moreover, appellant is a "holder for value" under the code definition obtaining in this state since the enactment of the negotiable instrument law. Section 3108 of our Civil Code now reads: "Where the holder has a lien on the instrument, arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien." [9] A person to whom a promissory note has been indorsed as collateral to indemnify him against possible future loss arising out of an existing liability incurred for and on behalf of his indorser has a lien on the note to the extent of any loss that he may sustain by reason of such liability. Plaintiff, therefore, became a holder of the

note for value to the extent of the amounts for which he was liable to the banks as a guarantor or surety for Akers.

[10] We are not unmindful that it also is provided by the negotiable instrument law (Civ. Code, sec. 3135, as amended in 1917) that "where the transferee receives notice of any infirmity in the instrument . . . before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him." In our opinion this provision is applicable only where the obligation incurred by the holder of the note is such that, on discovering the infirmity in the instrument, he is relieved from all further legal obligation to make any further payment, as, for example, where the note has been transferred to him in consideration of his promise to make future payments to his transferor. In that case, if it should turn out that, by reason of fraud on the part of the transferor, the maker of the note had a defense thereto, the transferee would be under no legal obligation to pay the balance of the amount that he had agreed to pay to his transferor as a consideration for the transfer. In the instant case, however, appellant's liability to the banks continued regardless of any discovery he may have made respecting the fraud alleged to have been perpetrated by his transferor on these respondents as the makers of the note. Appellant's antecedent liability to the banks was the consideration for the transfer of the note to him as collateral security. The extent of that liability never varied after the note was indorsed to him. His liability to the banks was fixed and unconditional, even though his loss or damage by reason of that liability were contingent upon the failure of Akers to pay to the banks the amounts due from him as the primary obligor. Appellant's liability to the banks being fixed, definite, and unconditional, it follows that, unless he had notice of the alleged fraud at the time when the note was transferred to him, he is in the position of an indorsee who does not receive notice of the infirmity until after the completion of his purchase of the note for value. And the rights of such a purchaser are not affected by such after-acquired notice. The meaning of section 3135 of the Civil Code is substantially this: If the transferee receives notice of the infirmity before he has paid all the consideration for

the note, he is a *bona fide* holder for value only to the extent that he had paid the consideration that he agreed to give. But in the instant case the consideration for the indorsement of the note to appellant, in addition to the $50 and the $36.20, consisted of appellant's pre-existing and unconditional liability to pay certain fixed and definite debts for which, as between themselves, his indorser was primarily liable, namely, the amounts due or to become due to the banks. Appellant's liability to the banks, as a guarantor or surety for Akers, was, of itself, a sufficient consideration for the indorsement of the note to appellant. As having some bearing upon this phase of the question, see *Miller* v. *Marks,* 46 Utah, 257, [148 Pac. 412].

For the foregoing reasons we conclude that the instruction No. 12 was misleading and not applicable to the facts of this case.

The conclusion at which we have arrived respecting instructions Nos. 11 and 12 renders it unnecessary to consider any of appellant's remaining assignments of error. What we have said should suffice to guide court and counsel on the retrial of the case.

There is one other fact that, perhaps, ought to be mentioned. Prior to the sale to respondents Akers had given appellant a chattel mortgage on the hogs. Though the evidence upon this phase of the case is exceedingly fragmentary and unsatisfactory, we infer that this mortgage had been given to appellant to indemnify him against any loss that he might sustain by reason of his liability on Akers' notes to the banks. Appellant did not release the chattel mortgage on the hogs until July 9, 1919, or about six weeks after the indorsement to him of the note that had been given by respondents for the purchase price of the hogs. Because appellant had agreed to turn over to Akers any balance of the proceeds of respondents' note, after he had reimbursed himself for all amounts previously loaned by him to Akers and any sums that he might have to pay to the banks on account of Akers' indebtedness thereto, we have concluded that the indorsement of the note to appellant was for the purpose of security only. We have inferred that the note was indorsed to appellant either as additional security to the chattel mortgage or as a substitute security. It is possible, however, that, when all

the facts are adduced on the retrial of the case, it may appear that it was agreed between Akers and appellant that the latter's surrender or release of the chattel mortgage should, of itself, constitute, in part at least, the consideration for Akers' indorsement of the note to appellant. If so, it may be that such agreement alone would constitute a sufficient consideration for the transfer, thus affording a different but sufficient ground for holding that appellant is a holder for value and in due course. However, as we have said, the evidence upon this phase of the case is hopelessly uncertain and indefinite, and for that reason we have preferred to reach our decision without considering what favorable effect, if any, this chattel mortgage and the release thereof may have upon appellant's claim to be a holder of the note for value and in due course.

The judgment is reversed and the cause remanded, with directions to the lower court to sustain appellant's demurrers to respondents' first and second affirmative defenses (designated in the answer as the second and third defenses, respectively), with leave to respondents to amend their answer should they be so advised.

Works, J., and Craig, J., concurred.