[Civ. No. 2454. Third Appellate District.—September 26, 1922.]

PEOPLES STATE BANK (a Corporation), Appellant, v.
B. PENELLO, Respondent.

PEOPLES STATE BANK (a Corporation), Appellant, v.
GEORGE BERTAINA, Respondent.

[1] PROMISSORY NOTES — INDORSEMENT—EQUITIES.—A promissory note
in the hands of an indorsee for value, in the usual course of busi-
ness and before maturity, if taken without notice of any infirmity
in the instrument and without knowledge of any facts that would
excite the suspicion of a prudent person, is not subject to existing
equities between the original parties.

[2] ID.—COLLATERAL SECURITY—STATUS OF INDORSEE.—The indorsee of
a promissory note merely as collateral security for a pre-existing
debt owing to him by his indorser is a holder for value and in the
usual course of business.

[3] ID. — ACTION BY INDORSEE — WANT OF KNOWLEDGE OF DEFECT IN
CONSIDERATION—EVIDENCE.—In this action by an indorsee of prom-
issory notes taken as collateral security for a pre-existing debt, the
only rational inference from the evidence is that plaintiff, in tak-
ing an assignment of the notes, acted in good faith and without
knowledge, either actual or constructive, of any defect in the con-
sideration therefor.

[4] BANKS AND BANKING—TRANSACTIONS WITH CUSTOMERS—PRESUMP-
TIONS.—Banks are warranted in assuming that their customers with
whom they have done business and whose honesty they have no
reason to suspect have not resorted to fraud in obtaining notes
which they proffer as collateral security, and they have a right in
transactions conducted according to the usual method which obtains
in business to act upon the presumption that a promissory note
was given for a sufficient consideration, that private transactions
have been fair and regular, and that the ordinary course of business
has been followed.

[5] PROMISSORY NOTES—COLLATERAL SECURITY FOR PRE-EXISTING DEBT
—INFIRMITY IN EXECUTION — KNOWLEDGE OF BANK — FORM OF IN-
DORSEMENT.—The fact that a bank took promissory notes as collat-
eral security for a pre-existing debt of the indorser under a form
of indorsement which relieved it of all the responsibilities as to
presentment, protest, and notice of dishonor which ordinarily at-

2. Holder of a bill or note as collateral security as a *bona fide*
holder, notes, 1 Ann. Cas. 275; 21 Ann. Cas. 936; Ann. Cas. 1917D,
386; 4 L. R. A. (N. S.) 1042; 31 L. R. A. (N. S.) 287.

tach to absolute ownership and which guaranteed payment by the indorser, did not constitute a circumstance sufficiently significant to justify a suspicion that the bank suspected the validity of the notes.

[6] ID.—TAKING OF NOTES—KNOWLEDGE OF FRAUD—BURDEN OF PROOF. In an action by a bank to recover on promissory notes taken as collateral security for the payment of a pre-existing debt of the indorser to the bank, wherein it was set up that the notes were procured by fraud and that the bank took them with knowledge thereof, it was error to instruct the jury that if the fraud had been proven, the burden of proof was on the plaintiff to show that it took the notes before maturity, for a valuable consideration, without notice of the fraud and in good faith, since the burden of showing that the plaintiff took the notes with knowledge of the fraud was on the defendant.

[7] ID.—RENEWAL NOTE—EXTINGUISHMENT OF ORIGINAL DEBT—RULE. A renewal note does not extinguish the debt represented by a note for which it is given in lieu, unless there is a distinct and unqualified agreement that it shall so operate.

[8] ID.—INDORSEMENT—FACE OF INSTRUMENT.—The signature on the face of a bill or note may be an indorsement if it was so intended by the parties.

[9] ID.—HOLDER OF NOTES AS COLLATERAL SECURITY—REMEDIES.—The *bona fide* holder of a note as collateral security may, in view of section 3006 of the Civil Code, proceed against the principal debtor or recover on the pledged note.

APPEAL from a judgment of the Superior Court of Merced County. E. N. Rector, Judge. Reversed.

The facts are stated in the opinion of the court.

W. N. Graybiel and Andrew R. Schottky for Appellant.

F. W. Henderson and Henry W. Longsdorf for Respondents.

BURNETT, J.—By stipulation these two actions were consolidated and tried together before the same jury. The complaints were filed the same day, each seeking to recover from the defendant the aggregate amount of one thousand dollars upon three promissory notes, the circumstances in both cases being identical. The notes were originally given

---

7.  Renewal note as discharging original, note, Ann. Cas. 1915A, 1084, 1094.

to the Hunt-Jewett-Bontz Co., a corporation, of Turlock, for one thousand dollars' worth of stock in said corporation to be issued to each defendant. After execution said notes were assigned before maturity, along with other notes of the Hunt-Jewett-Bontz Co., to plaintiff as collateral security for an indebtedness due from said company to plaintiff, said indebtedness being in excess of the aggregate amount of all the notes assigned. The execution of the notes and the assignment by the Hunt-Jewett-Bontz Co. to plaintiff were not disputed, but each defendant in his answer alleged that fraud was perpetrated by the company in obtaining the notes and that plaintiff at the time of the assignment had knowledge of the fraud or of such facts as to put it upon inquiry. The jury found for the defendants, and the appeal is from the judgment entered thereon.

The defense was set forth in the answer as follows: "That there is not now, nor was there at any time any consideration for any of said notes; that said defendant has at no time received any consideration therefor; that said plaintiff in said action took all of said notes with knowledge of said fact and with full knowledge that said defendant had received no consideration whatever for any of said notes." In the following paragraph is set forth an account of the transaction between the agent of the Hunt-Jewett-Bontz Co. and the defendants resulting in the execution of the notes. Therein certain fraudulent representations are disclosed and the averments are sufficient to justify a finding that the instruments were without consideration and void as far as the company is concerned. Then come these allegations:

"That defendant is informed and believes and therefore alleges upon information and belief that said plaintiff took said notes from said Company with full knowledge of all the facts herein alleged, and with full notice that said defendant had been induced to sign said notes for stock in said company and that there had not been and has not been at any time any consideration therefor.

"Defendant is informed and believes, and therefore alleges upon information and belief that said plaintiff has parted with no consideration for said notes and holds the same for the use and benefit of said Company."

[1] For the purpose of this decision we may concede that if the action had been brought by the original payee

the defense would be sufficient to defeat it, but the vital question herein affects the rights of an indorsee for value, in the usual course of business, of a note before maturity. The rule in such cases is well established by the authorities and, indeed, it is embodied in the provisions of the Civil Code (secs. 3105–3110), that the note in the hands of such indorsee, if taken without notice of any infirmity in the instrument and without knowledge of any facts that would excite the suspicion of a prudent person, is not subject to existing equities between the original parties. For a fuller discussion of this legal proposition we may refer to *Citizens' Bank* v. *Stewart,* 22 Cal. App. 91 [133 Pac. 337]; *Griswold* v. *Morrison,* 53 Cal. App. 93 [200 Pac. 62]; *Eames* v. *Crosier,* 101 Cal. 260 [35 Pac. 873]; *Blochman Commercial & Sav. Bank* v. *Moretti et al.,* 177 Cal. 256 [170 Pac. 419].

[2] As to the facts, there is no dispute that the notes were assigned to plaintiff before maturity as collateral security for the payment of a debt owing by the assignor to said assignee. There is no doubt that the indorsee of a note merely as collateral security for a pre-existing debt owing to him by his indorser is a holder for value and in the usual course of business. (*Griswold* v. *Morrison, supra;* sec. 3106, Civ. Code.) [3] We think it equally plain that the only rational inference from the evidence is that plaintiff, in taking an assignment of said notes, acted in good faith and without knowledge, either actual or constructive, of any defect in the consideration therefor. To show this it will be necessary to quote extensively from the testimony of two witnesses, J. E. Weaver and R. K. Bontz, who, as admitted by respondents, "are the only persons who know what actually transpired and what was said when the notes passed into the bank's possession."

Mr. Weaver, the president of the bank, testified: "The Hunt-Jewett-Bontz Company was indebted to the Peoples State Bank to the amount at that time of ten thousand three hundred dollars. I had previously, a few days before this, requested them or informed them rather that the notes were not in a satisfactory condition at the bank and requested them to do something about it. Mr. Bontz came to see me, young Mr. Bontz now I am speaking of, and he asked what they should do; naturally the first thing that I told him, I would like to have the notes paid; he said they

were not in a position to do that then; then I told him
that part of it must be paid and would like to have the
other secured in some way; then he agreed at that time
that he would pay a small note, a thirteen hundred dollar
note, the thirteen hundred dollar note previously had been
a fifteen hundred dollar note, but two hundred dollars had
been paid and the four thousand dollar and five thousand
dollar notes; so he told me that they had a considerable
amount of small notes that he would leave with me as
collateral. Now, this conversation was a few days prior to
the 16th; so on the 16th he came in and brought these
notes, these with a number of others, and he paid the
thirteen hundred dollar note as he agreed to do and left
this list of notes, these being among the others and we held
them there; I questioned him at the time about the ones
that I did not know; some of them were notes given by
people in the vicinity that I knew well and others were not;
these were among the ones that I did not know; I questioned
him about the standing of these men; he informed me that
they were perfectly good; he indorsed the notes in my
presence.''

He answered ''no'' to this question: ''Had you any knowl-
edge as to the making of the notes and the conditions sur-
rounding the making of the notes, at the time the notes
were transferred to you by the Hunt-Jewett-Bontz Com-
pany.'' In explaining further his desire to have the bank
secured he testified: ''I never had a statement from the
Hunt-Jewett-Bontz Company but I surmised they were
heavily in debt. . . . I knew the first year of their
storing sweet potatoes there that they could not have helped
but to have made a loss because they stored a great many
potatoes and they rotted to a great extent. I knew the bulk
of the business was not with us and I had no means of
knowing which way they were losing as they were not doing
the bulk of business with us; I knew these notes were not
in a satisfactory condition and I wanted to be a little
safer.''

As to the consideration for the notes, in the deposition of
the witness taken by respondents appear these questions
and answers: ''Q. What conversation was had as to the
consideration of these notes? A. I don't know as I ever
knew that, no explanation made, I cannot tell you, they were

given for different things, the informaton was not given to us at the time. Q. What did Mr. Bontz say to you, what these notes were for; what the company had taken them for? A. I would not say; I can tell what my understanding was some of them was given for stock of Hunt-Jewett-Bontz Company and others given for seed potatoes. There were other notes besides these, anywhere from twenty-five dollars up to these larger ones, one for five hundred dollars just paid.''

Again he testified: ''I have no recollection of making any inquiry about why the notes were given; I made inquiries about who the parties were and their financial standing; that is the only thing that interested me; I don't remember that I asked because I already knew that some of these were given for seed potatoes, that he got for seed; I knew they were taking out the potatoes when he bought them, he had a contract and that was just as far as I knew; I just happened to recognize the note in here and I know it had been given; I was not concerned as to why these notes were given; I was only concerned whether they were negotiable notes; I knew I did not inquire and I did not know at the time what the consideration was; I did not understand what a single one of them was for and what I may have thought it was wholly immaterial to me what they were given for.''

Mr. Bontz testified as follows: ''Mr. Weaver called me in to speak to me relative to the notes that we had at the bank and stated that he would like to have them rearranged in some manner, in answer to which I said I would take up the one for thirteen hundred dollars and put up security on the balance. This security was notes we held in the office, some for seed and for general stock shares. As I remember it nothing was said at the bank relative to what the notes were taken by ourselves for and on taking them over to the bank later on they seemed perfectly agreeable to Mr. Weaver and he took them in as security.''

He further testified that Mr. Weaver inquired who Mr. Penello was and likewise as to Mr. Bertaino and ''I recollect very distinctly that he didn't ask what the consideration was for'' and did not inquire how the notes had come into his possession.

In the transaction as detailed by these witnesses we find nothing startling or suspicious. As far as we are advised, the conduct of Weaver and of Bontz was entirely reasonable and what might be expected under the circumstances. It was quite natural that the creditor should want some security for the indebtedness and there is nothing to show that Weaver had any reason to question the integrity of the debtor or was not entirely justified in assuming that the notes were what they purported to be. We cannot doubt that the business was conducted as is usual in such cases. [4] Assuredly, banks are warranted in assuming that their customers, with whom they have done business and whose honesty they have no reason to suspect, have not resorted to fraud in obtaining notes which they proffer as collateral security. They have a right, in transactions conducted according to the usual method which obtains in business, to act upon the presumption that "a promissory note was given for a sufficient consideration," that "private transactions have been fair and regular" and "that the ordinary course of business has been followed." (Sec. 1963, subds. 19, 20, 21, Code Civ. Proc.)

[5] However, the able counsel for respondents contend that the following significant circumstances were indicative of a suspicion of some infirmity in the execution of said notes: 1. "Mr. Weaver knew that the preceding year had been a disastrous one for the Hunt-Jewett-Bontz Company and had surmised that it had suffered heavy losses"; 2. He knew that "the financial condition of the company was so precarious that he was unwilling to continue the loan at that amount, or at all, unsecured; 3. He knew that the company in its desperate situation was trying to sell stock bearing a high rate of interest and carrying a preference"; 4. "Since he had been solicited to purchase stock he knew what representations were being used to induce prospects to buy; 5. He had the 'impression' at the time of taking them that some of the notes received as collateral were stock subscription notes and it is fairly inferable that he knew the Penello and Bertaino notes were such," and finally it is is claimed that there is evidence of bad faith in the form of the indorsement by which the notes were transferred to the Bank. "The Bank took them under a special and peculiar form of indorsement which relieved it of all the

responsibilities as to presentment, protest, and notice of dishonor which ordinarily attach to absolute ownership and which guaranteed payment by the indorser.'' In none of these circumstances or all combined do we see anything that suggests fraud in the inception of the notes. No reason appears therein to inspire suspicion that the company had perpetrated a gross wrong, in fact had committed a crime in obtaining these notes. The situation would simply awaken apprehension that there might be difficulty in liquidating the indebtedness and would prompt an effort to obtain better security.

Moreover, in these statements respondents have mistakenly portrayed the evidence in the case. For instance, in answer to a question relating to Mr. Weaver's knowledge of the sale of stock at the time of the execution of the notes he testified: ''I cannot say whether I knew at that time or not, but I knew later that they were selling stock. Whether I knew it at that time or not, I don't know. I never knew very much about it, I can tell you that.''

As to the effort made to sell Mr. Weaver stock, he testified that some man came in to sell some stock, and in answer to the question whether he bought any he replied: ''I don't buy anybody's stock, that is the rule that I have made, I would not listen to them five minutes, I don't care what the scheme is, I would not talk to this man three minutes. I said I did not know anything about their scheme and I did not want to know.'' He testified further that this occurred *after* he had taken over the notes.

In reference to the form of indorsement appellant declares: ''That is the common indorsement that any bank requires and this particular indorsement was the indorsement printed upon the back of the notes in written stock form at the time the defendant originally signed the notes in favor of the Hunt-Jewett-Bontz Co.,'' and that these blank notes must have been secured from the First National Bank of Turlock, since the name of that bank appeared upon the face of said notes, and the only thing needed to complete the indorsement was the signature of said company. At any rate, there is no evidence that this so-called special form of indorsement was prepared by appellant. Moreover, we do not regard this circumstance as any evidence that appellant suspected the validity of the notes, but only as

indicative of natural caution on the part of the creditor. We may add that in *Commercial Security Co.* v. *Modesto Drug Co.,* 43 Cal. App. 162 [184 Pac. 964], this court held that ''the fact that the plaintiff took a bill of sale of the notes with a guaranty from the payee that they would be paid, in lieu of the customary indorsement in such a case, does not constitute a circumstance sufficiently significant to justify a suspicion that the notes were not all that they on their face purported to be.''

[6]   In this connection we may refer to the following instruction given by the court on request of defendants: ''In this action I charge you that in the event that you find that the fraud, if any, as alleged in the answers on file herein has been proven, that the burden of proof is upon the plaintiff to show that it took the notes in question before maturity, for a valuable consideration, without notice of said fraud, if any, and in good faith.''

The uncontroverted evidence showed that plaintiff did take said notes before maturity, for a valuable consideration and in good faith, but notwithstanding these facts, in order to recover, this instruction directed the jury that plaintiff must go further and prove that it had no notice of the fraud. Such, as we understand it, is not the law. The true doctrine is clearly set forth in the Eames case, *supra,* quoted with approval in *Blochman Commercial Bank* v. *Moretti, supra,* as follows: ''Upon proof by the defendant of fraud or illegality in the inception of the notes, the burden is cast upon the indorsee to show that he is an innocent holder. This the latter may do by showing that he purchased the note before maturity, or from an innocent indorsee, for value in the usual course of business. When this is done, unless the evidence shows that the note was taken by the plaintiff under circumstances creating the presumption that he knew the facts impeaching its validity, the burden is cast upon the defendant to show, if he would defeat the plaintiff in his action, that the latter took the instrument with notice of the defendant's equities.''

Since there was no evidence of any suspicious circumstances in connection with the transfer of the notes, and there could be no presumption that the indorsee knew any facts that might impeach the validity of said instruments, the burden was upon defendants to prove knowledge of

said facts. The instruction was therefore erroneous. It is true that Mr. Weaver testified that he had no knowledge of any fraud or of failure of consideration, but the jury may not have regarded that as sufficient to satisfy the requirement of the instruction as to the burden of proof. As to the suggestion of respondents that appellant should have proposed the modification or limitation of said instruction as indicated in the above quotation from the opinion in the Eames case, *supra*, it is sufficient to say that the appellant did request the proper instruction, which was given by the court, as follows: "The court also instructs the jury that the burden of proof is on the defendant to show that the bank had actual knowledge of the defense made here when it acquired the notes or had actual knowledge of such fact indicating the defense that its action in taking the instrument amounted to bad faith; and the court further instructs the jury that unless there are circumstances which incite suspicion the purchaser is not bound to make inquiry at the time of purchase."

From the verdict, though, we conclude that the jury must have followed the instruction proposed by defendants.

We are satisfied that respondents are in error in the claim that the original indebtedness to the Bank from said company was canceled, and therefore the notes held as collateral were released and discharged as security. It is true that a new note was given, but Mr. Weaver testified: "This is a renewal, that number on there signifies a renewal note. That is the number of the former note." He was positive and unshaken in repeated declarations that the debt was not extinguished, but the last note simply involved a different promise to pay the same indebtedness.

[7]  Of course, the rule is well settled that "a renewal note does not extinguish the debt represented by a note for which it is given in lieu, unless there is a distinct and unqualified agreement that it shall so operate." (*Anderson* v. *First National Bank of Los Angeles*, 55 Cal. App. 138 [203 Pac. 156]; *Savings Bank of San Diego County* v. *Central Market Co.*, 122 Cal. 28 [54 Pac. 273]; *Sather Banking Co.* v. *Briggs Co.*, 138 Cal. 724 [72 Pac. 352].)

[8]  Respondents argue that since the "old notes were signed by Hunt-Jewett-Bontz Co. and indorsed by the principal stockholders on the back" and "the new note was

signed by all parties as makers," there must have been a novation, that is, the substitution of a new obligation for the old. However, the "signature on the face of a bill or note may be an indorsement if it was so intended by the parties to the transaction. An indorsement, as the word signifies, usually is made upon the back of an instrument, but the place is held not to be essential." (*Shain* v. *Sullivan*, 106 Cal. 208 [39 Pac. 606].) As to the manner in which the signatures were made Mr. Weaver testified that they indorsed these notes on the face but ordinarily notes were indorsed on the back.

We think the only rational conclusion from the whole record is that the indebtedness was not extinguished by the new note, that said note was intended as renewed evidence of the portion of the original obligation which had not been paid, and that the notes of respondents were still held as collateral security for said amount which was greater than the face value of the security.

[9] Respondents make the point that "the Bank cannot prevail as against these notes because the principal obligation is collectible. (*Hulett* v. *Marine Bank*, 143 Mich. 219 [4 L. R. A. (N. S.) 1042, 106 N. W. 879].) It does not appear that the Hunt-Jewett-Bontz Co. were not financially responsible, though they were heavily involved. They maintained a balance with appellant and honored their checks for amounts equal to those claimed from either defendant." The case cited seems to support the contention of respondents, but it is against the weight of authority and the rule that prevails in this state.

In the case note found in 4 L. R. A. (N. S.), page 1042, it is stated that "ordinarily, the *bona fide* holder of a note as collateral security may enforce it without first resorting to the original debtor, the liability of the maker thereon not being conditional on the nonpayment of the principal debt, but being primary and absolute." Many cases and authorities are therein cited to justify said statement of the rule, but it is unnecessary to mention them specifically in this opinion. In this state, it may be said, the statute imposes no such condition as a prerequisite to the collection of a note pledged as security. (Sec. 3006, Civ. Code.) The note affords concurrent security and the object of giving it is to furnish another fund out of which the

principal debt may be paid, and its payment does not depend upon any condition or contingency not expressed in the note. We may add that the supreme court in *Sonoma Valley Bank* v. *Hill*, 59 Cal. 107, indorsed the doctrine announced in *Robinson* v. *Hurley*, 11 Iowa, 410 [79 Am. Dec. 497], as follows: "After the debt falls due the pledgee under the law has his election to pursue one of three courses: First, to proceed personally against the pledgor for his debt without selling the collateral security; or, second, to file a bill in chancery and have a judicial sale under a regular decree of foreclosure; or, third, to sell without judicial process, upon giving reasonable notice to the debtor to redeem." However, as we have seen, where the collateral consists of evidence of debt, the statute has taken away the remedy of sale but the creditor has his option to proceed against the principal debtor or to recover on the pledged note.

We can perceive no merit in the claim that appellant was an agent for collection only of said notes. The evidence all shows that they were assigned as security for the payment of the company's indebtedness to the Bank, and in such case the indorsee is regarded as a holder for value and in the usual course of business, and if the note is taken in good faith the indorsee is not subject to the equities existing between the original parties.

We think the judgment should be reversed and it is so ordered.

Finch, P. J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 26, 1922, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 23, 1922.

All the Justices present concurred.